State of Nebraska, appellee, v.
Avery R. Tyler, appellant.

___ N.W.2d ___

Filed October 2, 2015.    No. S-14-702.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure: Appeal and Error.** When reviewing whether a consent to search was voluntary, as to the historical facts or circumstances leading up to a consent to search, an appellate court reviews the trial court's findings for clear error. However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which an appellate court reviews independently of the trial court.

3. **Motions to Suppress: Appeal and Error.** Where a district court denies a motion to suppress without making explicit findings, an appellate court's review is framed by the factual findings and legal conclusions implicit in the district court's decision.

4. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

5. **Search and Seizure.** In order for a consent to search to be effective, it must be a free and unconstrained choice and not the product of a will overborne.

6. **Search and Seizure: Duress.** Consent to a search must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological.

7. **Search and Seizure.** Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.

8. **Constitutional Law: Search and Seizure: Search Warrants.** A warrant satisfies the particularity requirement of the Fourth Amendment if it leaves nothing about its scope to the discretion of the officer serving it.

9. **Search Warrants: Motions to Suppress.** Absent a showing of pretext or bad faith on the part of the police or the prosecution, the invalidity of part of a search warrant does not require the suppression of all the evidence seized during its execution.

10. **Constitutional Law: Search and Seizure: Evidence.** That a Fourth Amendment violation occurred does not necessarily mean that the exclusionary rule applies.

11. **Search Warrants: Evidence: Police Officers and Sheriffs.** The exclusionary rule is inapplicable to evidence obtained pursuant to an invalid warrant upon which police officers acted in objectively reasonable good faith reliance.

12. **Search and Seizure: Police Officers and Sheriffs.** The good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite a magistrate's authorization.

13. **Police Officers and Sheriffs: Presumptions.** Officers are assumed to have a reasonable knowledge of what the law prohibits.

14. **Search Warrants: Affidavits: Police Officers and Sheriffs: Appeal and Error.** In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.

15. **Motions to Suppress: Search Warrants: Affidavits: Police Officers and Sheriffs.** Evidence suppression will still be appropriate if one of four circumstances exists: (1) The magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, (2) the issuing magistrate wholly abandoned his judicial role, (3) the supporting affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.

Appeal from the District Court for Douglas County: Duane C. Dougherty, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ., and Moore, Chief Judge.

Cassel, J.

## I. INTRODUCTION

In this direct appeal from criminal convictions and sentences, Avery R. Tyler challenges the denial of his pretrial motions to suppress evidence seized in the execution of four search warrants. Although we will explain our conclusions in detail, we begin by summarizing them.

• The district court's implicit rejection of Tyler's testimony—claiming that his cell phone was taken from his person and not pursuant to the search warrant—was not clearly wrong.

• Tyler's written consent to an examination of the cell phone's contents was voluntarily given.

• Tyler's challenge that the warrants were not sufficiently particular fails because (1) a gunlock was seized pursuant to a sufficiently particular, severable portion of the warrant, and (2) the detectives acted in good faith reliance on the warrants.

Accordingly, we affirm Tyler's convictions.

## II. BACKGROUND

### 1. Shooting

In the early morning hours of September 3, 2012, Delayno Wright was shot and killed outside Halo Ultra Lounge (Halo) in Omaha, Nebraska. Before the shooting, Wright, his girlfriend Brittany Ashline, and his cousin LaRoy Rivers left Halo together and walked through the parking lot toward Wright's car. As they were walking, two men walked past them, one of whom grabbed or brushed against Ashline's

buttocks. Ashline turned around and confronted the men, and so did Wright.

Rivers thought he recognized one of the men, who was wearing a brown, striped shirt. Rivers saw the man in the brown, striped shirt break away from the group and go into the parking lot.

Rivers saw a dome light turn on in the parking lot. Seconds later, Rivers heard the voice of the man in the brown, striped shirt yelling, "'What's up now?'" and he heard gunshots. Rivers could not see the shooter. Ashline, who had walked away from the group, said she saw a man run to a tan or gold sport utility vehicle or Jeep and leave the scene after the shots were fired.

Wright indicated he had been hit, and friends drove him to a hospital. He was then transferred by ambulance to another hospital, where he was pronounced dead. His cause of death was a gunshot wound to his torso.

## 2. Investigation

Rivers remained at Halo and was taken to the police station. There, Rivers told a detective that he thought he recognized the man in the brown, striped shirt as a person he played basketball with in high school. Rivers told the detective that he thought the man's first name was Avery, but that he was unsure of the man's last name. The detective began searching high school basketball rosters on the Internet. Rivers accessed "Facebook" on the detective's computer and viewed the profile picture of Tyler. In the course of the investigation, investigators obtained a photograph of Tyler from a wedding he attended on September 2, 2012; in the photograph, he was wearing a brown, striped shirt.

Investigators obtained security footage that showed a sport utility vehicle leaving the scene at a high rate of speed near the time of the shooting. In the course of the investigation, detectives learned that Tyler's girlfriend owned a silver Jeep Commander.

Investigators found eight shell casings at the scene. A crime laboratory (lab) technician reported that the casings were all fired from the same gun and that there are about 20 guns capable of firing them, including an "FN Five-seveN" pistol. Investigators discovered Tyler had recently purchased an FN Five-seveN pistol at a sporting goods store in La Vista, Nebraska.

### 3. SEARCHES

Detectives applied for, and the county court issued, four search warrants authorizing police to search (1) Tyler's car, (2) Tyler's grandparents' residence, (3) Tyler's mother's residence, and (4) Tyler's girlfriend's residence. Each affidavit supporting the first three warrant applications contained the same information. The first three warrants each authorized a search of the described property for:

> 1) Any and all firearms, and companion equipment to include but not limited to ammunition, holsters, spent projectiles, spent casings, cleaning kits/cases and boxes, paperwork, and the like.
> 2) The ability to seize any item(s) of evidentiary value; to include clothing and cellular phones[.]
> 3) Venue items identifying those parties in control of [the property described].

Investigators executed the warrants and recovered a cell phone from Tyler's car, a gunlock bearing the "FN" logo from his grandparents' residence, and a letter from his mother's residence. Tyler signed a consent form that allowed detectives to download and search the contents of his cell phone.

In the data downloaded from Tyler's cell phone, investigators discovered another picture of Tyler at the wedding reception wearing a brown, striped shirt. They also extracted deleted text messages from the cell phone, including a message sent from the cell phone at 11:38 p.m. on September 2, 2012, that read: "Whats it like and where is halo?" Detectives obtained the cell phone's call records and location information separately from the cell phone service provider.

## 4. Suppression Hearing

Tyler was charged with murder in the first degree and use of a firearm to commit a felony for the death of Wright. Before trial, Tyler filed four separate motions to suppress the evidence. Relevant to this analysis, the motions argued that Tyler was unlawfully arrested and searched, that he did not voluntarily consent to the search of the contents of his cell phone, and that the warrants authorizing the searches were not sufficiently particular.

At the suppression hearing, testimony established that detectives had a uniformed officer watch Tyler's car while they obtained the search warrants. The car was parked at Tyler's place of employment, and detectives instructed the officer to pull Tyler over if he tried to leave. When Tyler left work, the officer pulled him over. Tyler testified that the officer immediately drew his weapon and had him exit the vehicle. Tyler said the officer then searched his person, taking his cell phone and wallet from his pockets and placing them "on the seat of my vehicle, in the driver's seat." The officer then handcuffed him and immediately placed him in the back of his squad car. Tyler waited in the squad car for about 10 to 15 minutes until detectives, Chris Gordon and Dave Schneider, arrived and showed him the warrant. They waited together for the crime lab to arrive; the crime lab took pictures before the search began. Gordon and Schneider then searched his car.

At the suppression hearing, the State did not present evidence contradicting Tyler's claim that the officer removed his cell phone and wallet from his pockets. The uniformed officer who stopped and held Tyler did not testify at the hearing. Gordon and Schneider testified that the cell phone was in the car when they arrived, which was after the stop occurred.

After the search, the detectives released Tyler from the squad car and handcuffs. What happened next was disputed. Tyler testified that Gordon and Schneider told him they were going to take his cell phone because it was part of his vehicle.

He claimed the detectives did not ask him permission to search the cell phone or indicate they would get a search warrant. Tyler asked when he would get his cell phone back, and the detectives told him that they could download the data from the cell phone "'pretty quickly,'" but that if there was a lock code, the process would take longer. According to Tyler, one detective said, "'If you sign this [form], then it gives us permission to allow you to unlock your code, then you will be able to get it back sooner.'"

Tyler signed the form, titled "Permission to Search Digital Media Device," without reading it. Tyler testified, "'I thought that I was signing permission to be able to touch my phone . . . .'" The form provided, in relevant part:

> I, Avery Tyler, voluntarily authorize Det. Herfordt #1746, or any other employee of the OMAHA POLICE DEPARTMENT or its designees, to search all cell phones, computers, electronic or data storage devices and/or retrieval systems, digital mediums or any related peripherals described below[.]
>
> . . . .
>
> I hereby knowingly, intelligently and voluntarily give permission for this search freely and voluntarily, and not as the result of threats or promises of any kind.

The detectives then took the cell phone to the station to download its data. Tyler admitted on cross-examination that he has a degree in business administration and that he was 2 weeks from graduating with his master's degree when the search occurred.

The detectives told a different version of events. Schneider testified that he told Tyler, "'We're going to take your phone as part of the search of your vehicle to be processed or searched later.'" He then explained to Tyler that "it would either be via a search warrant or a permission to search" and that it was "completely his decision if he wanted to give permission." He told Tyler that waiting for a warrant would take longer because no one was available to get a warrant over the weekend. Tyler

wanted his cell phone back quickly, and he agreed to give permission to search to speed up the process. To accommodate Tyler, Schneider told him that he could come pick up his cell phone at the station as soon as they were done downloading its data. Because Schneider did not have any permission forms with him, Tyler and Schneider met at the station, where Tyler signed the form. Schneider admitted he was not sure whether the form was signed on the scene or at the station. Detectives then downloaded the data on the cell phone, and Tyler picked it up the next day.

The detectives also testified regarding the contents of the search warrants. Schneider admitted that at the time they obtained the warrants, investigators had no information about any cell phones registered to Tyler. Gordon testified that he includes a request to seize all cell phones in his search warrants, regardless of whether he has any evidence that a cell phone was used in the criminal act. He does the same for firearms. Gordon also explained that a venue item is "some sort of documentation, a letter, mail, an ID correlating [a person] with that particular residence." He admitted that when looking for a "venue item," police can look virtually anywhere throughout the whole house. He also testified that he had applied for over 100 search warrants during his time in the homicide unit and was never denied one.

The district court did not articulate any findings from the bench. It denied all four motions to suppress in a subsequent order. There, the district court specifically determined that the warrants were sufficiently particular and that Tyler signed the consent form voluntarily. It made no finding regarding whether Tyler was unlawfully searched and seized pursuant to the search of his car.

## 5. Trial

The challenged evidence was admitted at trial, over Tyler's renewed objections. The State also introduced a photograph of Tyler's car, taken before the search. It depicts his cell

phone in the center console, rather than on the front seat as Tyler claimed.

Tyler was convicted by a jury on both counts. The district court sentenced Tyler to life in prison for the murder and 20 to 30 years' imprisonment for the firearm conviction. Tyler filed this timely appeal.

## III. ASSIGNMENTS OF ERROR

Tyler assigns, restated, that the district court erred in overruling his motions to suppress (1) evidence obtained from his cell phone, because it was seized during the unlawful arrest and search of his person and car; (2) evidence obtained from his cell phone, because his consent to its search was not voluntary; and (3) the gunlock seized during the search of his grandparents' residence and the cell phone seized from his car, because the warrants were not sufficiently particular.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[1]

[2] Likewise, we apply the same two-part analysis when reviewing whether a consent to search was voluntary. As to the historical facts or circumstances leading up to a consent to search, we review the trial court's findings for clear error. However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which we review independently of the trial court.[2]

---

[1] *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013).

[2] *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009).

## V. ANALYSIS

### 1. Seizure of Cell Phone

Tyler claims the district court erred when it overruled his "motion to suppress evidence obtained from the cell phone seized during the unlawful arrest and search of [Tyler] and his automobile."[3] In his brief, he argues, "The seizure of the phone is the fruit of the unlawful arrest of [Tyler] and the evidence obtained from that seizure should be suppressed."[4] He also argues the call records and location information investigators secured separately from the cell phone service provider are "fruit of the original unlawful seizure of the phone."[5] It is not clear which motion Tyler intended to reference in this first assignment of error. Though it references a single "motion," the assignment could denote either of two motions. We will assume Tyler challenges the district court's denial of both motions.

The district court made no specific finding regarding whether Tyler was unlawfully searched and arrested. We note that Tyler did not assign this omission as error. We have directed district courts to "articulate in writing or from the bench their general findings when denying or granting a motion to suppress."[6] We noted in *State v. Osborn*[7] that such findings may be essential to proper appellate review, for "[w]ithout guidance, we might not know whether the trial court rejected a defendant's factual contentions or had acted on some legal basis." We stated that "[t]he degree of specificity required will vary" from case to case.[8]

[3,4] Articulated findings by the district court would have been helpful to our review of this appeal. Nevertheless, where

---

[3] Brief for appellant at 11.

[4] *Id*. at 14.

[5] *Id*. at 15.

[6] *State v. Osborn*, 250 Neb. 57, 67, 547 N.W.2d 139, 145 (1996).

[7] *Id*. at 66-67, 547 N.W.2d at 145.

[8] *Id*. at 67, 547 N.W.2d at 145.

a district court denies a motion to suppress without making explicit findings, "[o]ur review is framed by the factual findings and legal conclusions implicit in the district court's decision . . . ."[9] Furthermore, when a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[10]

We upheld a district court's implicit finding in *Osborn*.[11] There, the defendant claimed that he was locked in a room while waiting to be interviewed and that this detention constituted an illegal seizure. The district court denied the defendant's motion to suppress without making factual findings. We stated that the "trial court clearly found the testimony of the police officers that the interview room door was unlocked and that the door was generally open to be more credible than [the defendant's] testimony."[12] We also upheld a district court's implicit finding in *State v. Martin*.[13] There, the defendant testified at a suppression hearing that a detective promised him that only certain charges would be filed in exchange for his confession. The detective denied making such a promise. The district court denied the defendant's motion to suppress without making factual findings. We upheld the district court's decision and inferred that the court "obviously disbelieved and rejected" the defendant's testimony.[14]

Here, the district court implicitly rejected Tyler's claim that his cell phone was taken from his person when it denied his motions to suppress. The trial judge was entitled to disbelieve Tyler's version of events. And at trial, evidence

---

[9] *Id.*

[10] *State v. Bromm*, 285 Neb. 193, 826 N.W.2d 270 (2013) (citing *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006)).

[11] *State v. Osborn, supra* note 6.

[12] *Id.* at 67, 547 N.W.2d at 145.

[13] *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993).

[14] *Id.* at 381, 500 N.W.2d at 519.

supported the district court's negative assessment of Tyler's credibility.

A photograph taken by the crime lab and presented at trial supports the district court's implicit finding by contradicting Tyler's testimony regarding the cell phone's location. It shows the cell phone was located in the cup holder of the car's center console, rather than on the driver's seat as Tyler claimed. Tyler testified that only one officer pulled him over. He claimed that after the officer placed his cell phone and wallet "in the driver's seat," the officer took Tyler to the squad car "[i]mmediately," and that they waited there together. Schneider testified that the vehicle was not searched before he arrived, and Tyler said that the crime lab took pictures before the search began. Tyler never presented any evidence to explain how his cell phone moved from the seat of the vehicle, where he claimed it was placed by the officer, to the center console, where it was depicted in the photograph. This inconsistency renders his testimony suspect.

We conclude that the district court's implicit finding was not clearly erroneous. Thus, the cell phone was obtained pursuant to the search warrant for Tyler's car and not pursuant to a search of his person.

Because the cell phone was not taken from his person, we need not address whether Tyler was unlawfully arrested. The district court implicitly concluded that the cell phone and its contents were not derived from the act of holding Tyler. Police held Tyler while they searched his car. But the cell phone was located in the car, and the search of the car was performed pursuant to a warrant. It necessarily follows that the cell phone was discovered pursuant to the warrant and not because of an arrest. Thus, even if holding Tyler did constitute an arrest, the cell phone was not the fruit of the arrest, and suppression is not an appropriate remedy.

Tyler also argues that the call records and location information obtained separately from the cell phone service provider should have been excluded as fruit of the original

unlawful seizure of the cell phone. Because we uphold the district court's implicit finding that the cell phone was not taken from his person, we need not address this claim.

## 2. Voluntary Consent to Examination of Contents

Tyler also claims the district court erred in denying his motion to suppress evidence from his cell phone, because his consent to its search was not freely, voluntarily, and intelligently made. The district court concluded that Tyler "voluntarily and with knowledge signed a document specifically granting law enforcement" consent to search his cell phone.

[5-7] In order for a consent to search to be effective, it must be a free and unconstrained choice and not the product of a will overborne.[15] Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological.[16] The determination of whether the facts and circumstances constitute a voluntary consent, satisfying the Fourth Amendment, is a question of law.[17] Whether consent was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.[18]

We upheld consents given under factually similar circumstances in *State v. Horn*[19] and *State v. Prahin*.[20] Because our standard of review has since changed, we merely note these cases.

More recently, we concluded that consent to search was given voluntarily in *State v. Hedgcock*.[21] There, an officer asked the defendant for consent to search his vehicle, and the

---

[15] *State v. Magallanes*, 284 Neb. 871, 824 N.W.2d 696 (2012).

[16] *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015).

[17] *Id.*

[18] *Id.*

[19] *State v. Horn*, 218 Neb. 524, 357 N.W.2d 437 (1984).

[20] *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990).

[21] *State v. Hedgcock, supra* note 2.

defendant replied, "'Go ahead.'"[22] We noted that the officer used a conversational tone and that there was no evidence of any coercive conduct by the officers.

Here, the totality of the circumstances surrounding Tyler's consent demonstrates that it was given voluntarily. Several factors drive this conclusion.

First, Tyler was released from the squad car and the handcuffs before the discussion regarding his cell phone took place, and he participated in the search by helping the officers unlock the cell phone's lock code.

Second, although Tyler testified that the detectives never told him they needed a warrant to search his cell phone, Schneider testified that they did. We cannot say that the district court's implicit credibility assessment was clearly wrong. Schneider said he told Tyler that either they would hold his cell phone over the weekend until a search warrant could be obtained or Tyler could give permission for the search. Schneider testified that he told Tyler it was "completely [Tyler's] decision." A statement of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion.[23]

Finally, although Tyler claimed that he did not read the permission form, he admitted that he signed it. The form specifically stated that it authorized the Omaha Police Department to search electronic devices. Tyler had a degree in business administration, he was about to receive his master's degree, and he worked as a business intelligence analyst. Given Schneider's statements and Tyler's background, the district court could properly infer that Tyler knowingly signed the form.

We conclude Tyler voluntarily consented to the search of his cell phone. The district court did not err when it denied Tyler's motion to suppress on this issue.

---

[22] *Id.* at 818, 765 N.W.2d at 481.

[23] *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

### 3. Particularity of Search Warrants

In his last claim of error, Tyler argues the gunlock and cell phone discovered pursuant to the searches of his car and grandparents' home should have been suppressed because the warrants authorizing the searches were not sufficiently particular. We conclude that the provision authorizing police to search for "[a]ny and all firearms" was sufficiently particular. Therefore, the gunlock was properly seized pursuant to this valid, severable portion of the warrants under the rule we adopted in *State v. LeBron*.[24] We do not address whether the other provisions were valid, because we conclude that even if they were not, investigators acted in good faith reliance on the warrants.

### (a) Particularity Required

[8] The Nebraska Constitution provides in part that "no warrant shall issue but upon probable cause . . . and particularly describing the place to be searched, and the person or thing to be seized."[25] The Fourth Amendment similarly provides that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." A warrant satisfies the particularity requirement if it leaves nothing about its scope to the discretion of the officer serving it.[26]

### (b) Particularity of These Warrants

The challenged warrants authorized searches of Tyler's car and his grandparents' house for:

> 1) Any and all firearms, and companion equipment to include but not limited to ammunition, holsters, spent projectiles, spent casings, cleaning kits/cases and boxes, paperwork, and the like.

---

[24] *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984).

[25] Neb. Const. art. I, § 7.

[26] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014) (citing *U.S. v. Clark*, 754 F.3d 401 (7th Cir. 2014)).

2) The ability to seize any item(s) of evidentiary value;
to include clothing and cellular phones[.]

3) Venue items identifying those parties in control of
[the property described].

Tyler claims the first provision violates the particularity requirement, because police knew the caliber of the weapon used in the murder. He asserts that the particularity requirement limits the scope of a search to weapons of that caliber. We disagree.

We have noted that the particularity requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant, or permit seizure of items other than what is described.[27] The 10th Circuit has recognized that "'[A] warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit.'"[28]

This provision was not open-ended. It authorized police to search for firearms and companion equipment; the scope of the search was not left to the discretion of the officers. Furthermore, the nature of the activity under investigation justifies its scope. Police were investigating a murder performed with a gun. They learned from the crime lab that about 20 guns were capable of firing the bullets recovered from the scene. The provision was sufficiently particular.

The gunlock Tyler sought to suppress was discovered pursuant to this valid portion of the warrant. The portion is severable under our decision in *LeBron*.[29] There, we approved of the approach adopted by the Eighth Circuit in *United States v. Fitzgerald*,[30] where the court held that a warrant may be

---

[27] *Id.*

[28] *U.S. v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014) (quoting *U.S. v. Riccardi*, 405 F.3d 852 (10th Cir. 2005)).

[29] *State v. LeBron, supra* note 24.

[30] *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983) (en banc).

severable and valid in part, even though it may be invalid in part for lack of particularity.

[9] We noted that the Eighth Circuit stated:

"Accordingly, we follow the approach which the First, Third, Fifth, Sixth, and Ninth Circuits, and several states, have adopted, and hold that, absent a showing of pretext or bad faith on the part of the police or the prosecution, the invalidity of part of a search warrant does not require the suppression of all the evidence seized during its execution. More precisely, we hold that the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant (assuming such evidence could not otherwise have been seized, as for example on plain-view grounds during the execution of the valid portions of the warrant), but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain[-]view grounds, for example—during their execution). This approach, we think, complies with the requirements of the fourth amendment."[31]

Applying this rule in *LeBron*, we concluded a stolen video cassette recorder was described with sufficient particularity and was discovered pursuant to the particular portion of the warrant. We thus severed that portion and determined that suppression was not required. We reach the same conclusion here.

The gunlock in question was seized pursuant to the valid portion of the warrant authorizing police to search for firearms and companion equipment. Any infirmity of the other portions of the warrant does not require suppression of this evidence.

### (c) Good Faith

We need not address the constitutionality of the other provisions of the search warrants. Even if they violated the

---

[31] *State v. LeBron, supra* note 24, 217 Neb. at 454-55, 349 N.W.2d at 921 (quoting *United States v. Fitzgerald, supra* note 30).

particularity requirement, exclusion is not required, because the good faith exception applies.

[10,11] That a Fourth Amendment violation occurred does not necessarily mean that the exclusionary rule applies.[32] The exclusionary rule is a judicially created remedy designed to deter police misconduct.[33] It is inapplicable to evidence obtained pursuant to an invalid warrant upon which police officers acted in objectively reasonable good faith reliance.[34]

[12-14] We have said that the good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite a magistrate's authorization.[35] Officers are assumed to have a reasonable knowledge of what the law prohibits.[36] In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.[37]

[15] Evidence suppression will still be appropriate if one of four circumstances exists: (1) The magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, (2) the issuing magistrate wholly abandoned his judicial role, (3) the supporting affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.[38]

---

[32] *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012).

[33] *State v. Hill*, 288 Neb. 767, 851 N.W.2d 670 (2014).

[34] *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000).

[35] *State v. Sprunger, supra* note 32.

[36] *Id.*

[37] *Id.*

[38] *Id.*

We recently applied the good faith exception in *State v. Henderson*,[39] where officers searched a cell phone pursuant to warrants that authorized searches for "'[a]ny and all information.'" Although we concluded that the warrants at issue in *Henderson* were not sufficiently particular, we determined that the good faith exception applied, in part because "they also contained references to specific items that did not make the warrants so facially deficient that the officers could not reasonably presume them to be valid and the search legal."[40] We also noted that the evidence obtained and admitted was relevant and would have been found pursuant to a properly limited warrant.

Considering the totality of the circumstances, we reach the same conclusion here. The warrants at issue listed both specific categories and specific individual items for the search. They were not so deficient that a reasonably well-trained officer would have known the warrants were illegal, and the evidence that the officers obtained was relevant to the murder under investigation.

None of the other criteria for suppression applies. There is no suggestion that the officers' affidavits misled the magistrate or that the magistrate abandoned his judicial role. And the supporting affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. We conclude that the good faith exception applies to the execution of these search warrants.

## VI. CONCLUSION

We conclude the district court did not err by overruling Tyler's motions to suppress. Accordingly, we affirm the judgment of the district court.

Affirmed.

---

[39] *State v. Henderson, supra* note 26, 289 Neb. at 276-77, 854 N.W.2d at 625.

[40] *Id*. at 292, 854 N.W.2d at 635.