Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:10 PM CST

State of Nebraska, appellee, v.
Harold W. Baker, appellant.
___ N.W.2d ___

Filed November 17, 2017.    No. S-16-979.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Pretrial Procedure: Trial: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

3. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

4. **Search Warrants: Probable Cause.** The particularity requirement for search warrants is distinct from, but closely related to, the requirement that a warrant be supported by probable cause.

5. **Search Warrants: Probable Cause: Evidence.** A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.

6. **Search and Seizure: Search Warrants.** The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.

7. **Search Warrants: Police Officers and Sheriffs.** A search warrant must be sufficiently particular to prevent an officer from having unlimited or unreasonably broad discretion in determining what items to seize.

8. **Constitutional Law: Search Warrants: Police Officers and Sheriffs.** To satisfy the particularity requirement of the Fourth Amendment, a search warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized.

9. **Evidence.** A court must consider whether a statement made by a third party admitted to give context to a party's statement is relevant.

10. **Criminal Law: Evidence.** To evaluate the relevance of a third party's statement for the purpose of providing context, a court must compare the probative value of the defendant's statement with and without the added context; if the third-party statement makes the defendant's statement any more probative, the third-party statement is itself relevant.

11. **Evidence.** When analyzing evidence under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), courts not only consider the risk of unfair prejudice or other dangers the evidence carries, but weigh those dangers against the probative value of the evidence, determining whether the former substantially outweighs the latter.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

NATURE OF CASE

Harold W. Baker was found guilty by a jury of his peers of murdering Jermaine J. Richey and Derek L. Johnson and attempting to murder Demetrion A. Washington and Lamar A. Nedd. He was sentenced by the court to life imprisonment on each of the two first degree murder convictions, 30 to 40 years' imprisonment on each of the two attempted first degree murder convictions, and 25 to 30 years' imprisonment on each

of the four use of a firearm to commit a felony convictions. Baker appeals.

At issue is whether the search warrant for Baker's residence was unconstitutional because it lacked particularity by authorizing the police to search for "[a]ny and all" firearms in his residence. Also at issue is whether evidence found during the course of and as a result of the search should be suppressed if the warrant were found to be invalid. Baker also claims that the trial court erred by admitting a recording of a telephone conversation that he made to his ex-girlfriend from jail. Because we conclude that the search warrant was sufficiently particular and that the trial court's admission of the telephone conversation was not an abuse of discretion, we affirm.

## BACKGROUND

Baker was charged with eight counts: count I, first degree murder, a Class IA felony, for the killing of Richey; count II, use of a firearm to commit a felony, a Class IC felony; count III, first degree murder, a Class IA felony, for the killing of Johnson; count IV, use of a firearm to commit a felony, a Class IC felony; count V, attempted first degree murder, a Class II felony, for the attempted murder of Washington; count VI, use of a firearm to commit a felony, a Class IC felony; count VII, attempted first degree murder, a Class II felony, for the attempted murder of Nedd; and count VIII, use of a firearm to commit a felony, a Class IC felony.

In July 2016, Baker was tried before a jury in the Douglas County District Court. The jury found him guilty on all counts. Baker was sentenced to life imprisonment on each of the two first degree murder convictions, 30 to 40 years' imprisonment on each of the two attempted first degree murder convictions, and 25 to 30 years' imprisonment on each of the four use of a firearm to commit a felony convictions. The court ordered that all of the sentences be served consecutively.

The shooting that led to the deaths of Richey and Johnson occurred outside of an apartment building on Meredith Avenue in Omaha, Nebraska, on December 21, 2014. The building has

entrances on its north and the south sides and parking stalls along its east side. At the time of the shooting, the building was equipped with three security cameras: one monitoring an office inside the building, one monitoring the north entrance, and one monitoring the east parking area.

Prior to the shooting, a blue Crown Victoria—the victims' vehicle—pulled into a parking stall on the east side of the apartment building. One of the building's security cameras showed a black sport utility vehicle (SUV) subsequently park in the east parking area, two parking stalls to the south of the Crown Victoria. At this time, the occupants of the Crown Victoria exited the vehicle and appeared to follow the SUV's occupants into the south entrance of the building.

The security camera on the north entrance to the apartment building showed that at around 5:05 p.m., two individuals walked into the building, with the door opened for them from the inside by a third individual. Neither was openly carrying a rifle, but the individual later identified as Baker walked up the steps in an odd stiff-legged manner, which the prosecution argued at trial was because he was concealing a rifle in his pants.

At around 5:07 p.m., the security camera footage of the east parking area showed the four individuals from the Crown Victoria returning to their vehicle from the apartment building's south entrance. As these four entered the vehicle, two individuals, similar in appearance to the two individuals that had recently entered the north entrance, also came to the east parking area from the area of the south entrance. These two stood waiting behind the nearby SUV while the four other individuals entered the Crown Victoria. One of the two individuals standing waiting pulled out a rifle, held it up to his shoulder, stepped out from behind the SUV, and fired multiple shots into the Crown Victoria. The driver of the Crown Victoria, Richey, slumped over in his seat. The front passenger, Johnson, ran out of the vehicle a short distance before grabbing his chest and falling over. The two rear passengers exited the vehicle.

Johnson died of a gunshot wound to the heart, and Richey died 16 days later from a gunshot wound to the head. After the shooting, police spoke with Washington, who had also been shot. Washington claimed he did not know the shooter. Nedd was also in the Crown Victoria during the shooting and sustained a small injury on his rib cage from glass fragmentation. Nedd claimed not to know the shooter.

Police recovered 30 spent ammunition casings at the scene. All of the recovered casings were from .223-caliber cartridges.

Police obtained a search warrant to search Baker's residence, where he lived with his brother and his brother's family. During the search of Baker's residence, police recovered a blue jacket bearing a distinctive logo and text, similar to the jacket worn by the shooter in the security camera footage, and a .223-caliber semiautomatic rifle with a 30-round magazine containing 18 loaded rounds. Baker was not located at the residence. Police subsequently obtained an arrest warrant for Baker and arrested him.

Testing of DNA samples taken from the rifle and the jacket showed that Baker was very likely a contributor to both samples. Ballistics testing of the rifle showed that 27 of the 30 casings found at the crime scene had been fired from the rifle found in Baker's residence; 3 of the casings were not suitable for comparison.

Baker filed a pretrial motion to suppress any and all evidence found as a result of the search of his residence on the basis that the search warrant was not sufficiently particular.

The search warrant authorized police to search for, among other things: "Any and all unknown make and model firearm(s), to include handguns, rifles, and / or shotguns, along with ammunition, spent projectiles and spent shell casings, and all companion equipment for these firearm(s), including holsters, cleaning kits, sales and/or registration paperwork, and original packaging/boxes."

The warrant affidavit provided, in addition to a description of the build and clothing of the two individuals seen entering

the building and committing the shooting, the following facts: Police reviewed security camera footage from the Meredith Avenue apartment building. They had received an anonymous tip that Baker had bought a gun from Adren Goynes-Wynn, that Baker used the gun in the shooting, and that Baker returned the gun to Goynes-Wynn, who hid the gun in his mother's apartment at the Meredith Avenue apartment building.

The affidavit also stated that police had responded to a shooting at another Omaha residence on January 11, 2015, where numerous .223-caliber casings were found. Prior to that shooting, Baker had come to see his ex-girlfriend, Shyanne Clark. Baker became upset when he observed that there was another man in her residence. Baker made a comment to the effect of "'I'm about to shoot shit up,'" after which Clark heard numerous gunshots outside the residence. Clark told police that Baker had admitted to shooting and killing two individuals at the Meredith Avenue apartment building and that she had seen Baker with a rifle in the past. Clark confirmed the location of Baker's residence. Clark identified Baker as one of the individuals seen on the security camera footage entering the Meredith Avenue building just prior to the shooting based on his wearing of the blue jacket bearing the distinctive logo and text and his "tasseled stocking cap," which she had given him.

The affidavit also said that shooting victim Washington told police that he observed two individuals in the Meredith Avenue apartment building just before they walked out to the parking lot prior to the shooting. Washington said that he had a brief interaction with one of the parties before exiting the building. Out of a photographic lineup array, Washington identified Baker as one of the individuals and Goynes-Wynn as the other individual.

At the hearing on Baker's motion to suppress, the only evidence presented as to the types of weapons capable of firing .223-caliber cartridges was the testimony of an Omaha Police Department detective:

Q. All right. Concerning the [crime] scene investigation, as I understand it, the only — only casings that were observed or recovered were all the same caliber, this 223?

A. That's correct, sir.

Q. All right. And is 223 something that would be consistent with handguns being able to fire, or do you know?

A. Well, primarily it's a rifle cartridge, but there are rifles that are considered pistols or handguns [by] the [Bureau of Alcohol, Tobacco, Firearms and Explosives], and it's just a shortened version of an M-4 or AR-15 styled rifle, but they are considered nowadays to be pistols.

Q. Okay. But they're basically assault weapons?

A. They're assault weapons, yes, sir.

The trial court overruled Baker's motion to suppress as it related to the search for weapons in his residence, relying on this court's holding in *State v. Tyler*.[1]

On January 21, 2015, the day that he was arrested, Baker telephoned his ex-girlfriend, Clark, from jail. The call was recorded and played for the jury at Baker's trial. A transcript of the call was given to jurors while the call was played, which transcript Clark had reviewed for accuracy. The most relevant portion of the conversation is as follows:

**Baker:** Man, that shit was crazy. I'm like. I don't know man. It just, I guess, you know, it's meant to be now. Like, but, I can see if like, like if I did the shit, ya know what I mean, like you know and was running and shit but they tryin' to get . . .

**Clark:** The only thing is, [Baker]. The only thing is . . .

**Baker:** Just listen. I'm gonna read my charges. Just listen to this dumb ass shit.

---

[1] *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015), *cert. denied* ___ U.S. ___, 136 S. Ct. 1207, 194 L. Ed. 2d 212 (2016).

**Clark:** I know your charges.

**Baker:** They talking 'bout four counts of first degree murder.

**Clark:** No it was two counts of first degree murder. Two counts of attempted murder . . .

**Baker:** No but now they talkin' 'bout. But now, but now, but . . [.]

**Clark:** And two counts of use of a firearm for a felony.

**Baker:** Yes. But what's two. That's what I'm sayin'. Two weapons. No. What what, what, then I'm like, ya knaw I mean?

**Clark:** Because two people died and that other boy got hit. The only thing is, can you listen to me for a second. The only thing is they have pictures of you at the crime scene.

**Baker:** Do they?

**Clark:** Yes.

**Clark:** Yes. They showed them to me and you can tell that it . . . like you could just tell. Like, they showed me a bunch of pictures.

**Clark:** Of you at the crime scene. That's what, what got you hit. They had pictures from all of your homeboys['] Facebook[s] []and everything. Their Instagrams, everything.

**Baker:** But what did I . . . They had pictures, like. Alright, so . . .

**Clark:** They had pictures of you at the crime scene in your blue jacket. And then they have pictures of you on Facebook wearing your blue jacket. That's how they knew it was you at the crime scene.

**Baker:** I ain't gon nuttin' on faaa, uhhh.

**Clark:** They have, they have all of your homies['] Facebook pictures. They had a bunch of people's Facebook pictures, yuh. They showed me a bunch of stuff.

**Baker:** Damn. Damn. So it's like, so it's like, umm. Well, they tryin' to say I got four counts of murder and four counts of use of weapon. Ya know what I mean?

**Clark:** No. You just got two counts of murder, two counts of attempted murder.

**Baker:** What[']s two . . .

**Clark:** And the felony charge, the felony weapon charges. But you don't have a felony record, ever before any of this, before this, you don't have a felony record so everything's gonna be dropped to second degree. You know that right?

**Baker:** I don't know.

**Clark:** Yes. Because it's not like you woke up that morning and was like, ["]hey, let's go kill these mother fuckers["] and planned it all out. It was all, it was either your life or their life. Right?

**Baker:** Yeah.

**Clark:** Alright! So that's second degree. You didn't plan it. You had to do what you had to do.

**Baker:** Aww, shit man. This shit cray cray. I didn't know they came and talked to you, though. But . . [.]

**Clark:** Yeah, like yeah. I was . . .

**Baker:** Aight. The pictures, hey, the pictures, did, did they look, were they outside? Like, let me know . . .

**Clark:** Yeah. They were outside those . . . You could tell they were outside those apartments. It was like you and two other people walking.

**Baker:** Walkin'?

**Clark:** Yeah. Like one of you guys were going up the stairs and two of you were following, like not far behind.

**Baker:** But they got me shootin'. Do they got a picture of me in the action?

**Clark:** No. No.

**Baker:** Okay then. Then that's what they need. I didn't fuckin', motherfucker I'm outta state cuz, nigga I didn't want, know what I mean, do it. So, other than if somebody got a make, made up belief, a made up, umm,

story talkin' bout dat I had it. Know what I mean? And plus how the fuck I'm gon motherfuckin' have a, uh, uh, uh, man, a big ass, know mean gun, on me down there? Like get real. But, man. I just want you by my side. Whatever happens.

At trial, Baker objected to the admission of the telephone conversation based on hearsay and Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). The court overruled the objections, but offered the following limiting instruction to the jury at the time the recording of the conversation was played:

You're going to hear a phone conversation between . . . Clark and [Baker] that occurred on January 21st, 2015.

The statements made by . . . Clark are not to be considered by you for the truth of the statements she made, but are only received to aid you in providing context for the statements of [Baker]. You must consider . . . Clark's statements for that limited purpose and no other.

A substantially identical instruction was included in the final jury instructions.

At the conclusion of Baker's trial, the jury found him guilty on all counts.

## ASSIGNMENTS OF ERROR

Baker claims that the trial court erred in overruling his motion to suppress evidence found during the course of and as a result of the search of his residence. He also claims that the trial court erred in admitting the recorded telephone conversation between him and Clark.

## STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[2] Regarding historical facts, an appellate court reviews the trial

---

[2] *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[3] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[4]

[3] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[5]

## ANALYSIS

### Particularity of Search Warrant: "Any and All" Firearms

Baker argues that the search warrant that authorized the search of his residence for "[a]ny and all" firearms was invalid because it violated the particularity requirement of the Nebraska and U.S. Constitutions.

We note that Baker challenges the validity of the search warrant under both the Nebraska Constitution and the U.S. Constitution. He makes his argument about the particularity requirement under both constitutional provisions together and does not ask us to construe the Nebraska Constitution differently from the U.S. Supreme Court's construction of the U.S. Constitution. We generally construe article I, § 7, of the Nebraska Constitution in lockstep with the U.S. Supreme Court's construction of the Fourth Amendment, and we do so today.[6]

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] See *State v. Rocha, supra* note 2, 295 Neb. at 746, 890 N.W.2d at 202 ("[t]his court typically construes the enumerated rights in the Nebraska Constitution consistently with their counterparts in the U.S. Constitution as construed by the U.S. Supreme Court . . .").

Article I, § 7, of the Nebraska Constitution provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Similarly, the Fourth Amendment to the U.S. Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The "'particularity requirement'" thus demands that a warrant describe with particularity (1) "'the place to be searched'" and (2) "'the persons or things to be seized.'"[7] Here, the second part of the particularity requirement is at issue. Baker argues that the search warrant that authorized the seizure of "[a]ny and all" firearms was invalid because it failed to "particularly describ[e] the . . . things to be seized."[8]

It is well established that the primary historical factor leading to the adoption of the Fourth Amendment was the use of "'general warrants'" and "'writs of assistance'" by the British against American colonists, authorizing government officials to rummage through a person's belongings with no limitation on the scope of the search.[9] The Fourth Amendment barred such searches by requiring that warrants """"particularly

---

[7] *United States v. Grubbs*, 547 U.S. 90, 97, 126 S. Ct. 1494, 164 L. Ed. 2d 195 (2006). Accord, U.S. Const. amend. IV; Neb. Const. art. I, § 7.

[8] See U.S. Const. amend. IV. Accord Neb. Const. art. I, § 7.

[9] See, *Payton v. New York*, 445 U.S. 573, 583 n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *Stanford v. Texas*, 379 U.S. 476, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965); *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012). See, generally, Orin S. Kerr, *Applying the Fourth Amendment to the Internet: A General Approach*, 62 Stan. L. Rev. 1005 (2010) (discussing history of Fourth Amendment, general warrants, and particularity requirement); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531 (2005) (same); Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547 (1999) (same).

describ[e] the place to be searched, and the persons or things to be seized." ' "[10]

[4,5] The particularity requirement is distinct from, but closely related to, the requirement that a warrant be supported by probable cause.[11] A warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.[12] Here, Baker does not claim that the affidavit in support of the warrant does not establish probable cause to search for "[a]ny and all" firearms, but only that the warrant's description was insufficiently particular.

[6-8] Discussing the Fourth Amendment's particularity requirement, the U.S. Supreme Court nearly a century ago said, "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."[13] While it is not literally true that a warrant must be of such precise specificity that an officer has no discretion whatsoever in the execution of the search, a warrant must be sufficiently

---

[10] *Payton v. New York, supra* note 9, 445 U.S. at 585. See, also, *U.S. v. Sanjar*, 853 F.3d 190 (5th Cir. 2017).

[11] 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a) at 766 (5th ed. 2012 & Supp. 2017) ("requirement of particularity is closely tied to the requirement of probable cause"). See, also, *Maryland v. Garrison*, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987).

[12] 2 LaFave, *supra* note 11, § 4.6(a).

[13] *Marron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927). See, also, *Steele v. United States No. 1*, 267 U.S. 498, 504, 45 S. Ct. 414, 69 L. Ed. 757 (1925) (concluding that warrant's description of "'cases of whiskey'" was sufficiently particular); *State v. Tyler, supra* note 1; *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

particular to prevent the officer from having unlimited or unreasonably broad discretion in determining what items to seize.[14] The Eighth Circuit has explained that "'[t]o satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized.'"[15] The particularity requirement is one of "'practical accuracy rather than' of hypertechnicality."[16] But a warrant may not validly authorize a "general exploratory rummaging in a person's belongings" or "'fishing expeditions.'"[17]

Regarding the degree of particularity required in a warrant, the Sixth Circuit said:

> The degree of specificity required depends on the crime involved and the types of items sought. . . . The use of a generic term or a general description is not per se violative of the fourth amendment. . . . When a more specific description of the items to be seized is unavailable, a general description will suffice.[18]

Similarly, the Fifth Circuit has said, "Generic language may satisfy th[e] 'particularity' requirement if describing a more

---

[14] See, *U.S. v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) ("Fourth Amendment requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.' . . . Some interpretation is unavoidable"); *Strauss v. Stynchcombe*, 224 Ga. 859, 165 S.E.2d 302 (1968); 2 LaFave, *supra* note 11, § 4.6(a).

[15] *U.S. v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014). See, also, *U.S. v. Sanjar, supra* note 10, 853 F.3d at 200 (requiring "enough detail in the warrant to allow a reasonable agent to know what items she is permitted to take").

[16] *U.S. v. Sigillito, supra* note 15, 759 F.3d at 923. See, also, *U.S. v. Triplett, supra* note 14, 684 F.3d at 504 ("[r]easonable specificity is required, not 'elaborate detail'").

[17] *State v. Sprunger, supra* note 9, 283 Neb. at 539, 811 N.W.2d at 243. See, also, *City of Golden Valley v. Wiebesick*, 899 N.W.2d 152 (Minn. 2017) (Anderson, J., dissenting; Stras, J., joins in part).

[18] *U.S. v. Blakeney*, 942 F.2d 1001, 1026-27 (6th Cir. 1991) (citations omitted).

specific item is not possible."[19] And "'[t]he degree of specificity required will depend on the circumstances of the case and on the type of items involved.'"[20]

The Ninth Circuit has articulated the following factors for analyzing the particularity of a warrant:

> In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant . . . ; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not . . . ; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.[21]

In *State v. Tyler*,[22] this court considered the validity of a search warrant that authorized police to search for and seize "'[a]ny and all firearms.'" Police had recovered shell casings at the scene of the crime and had learned that the defendant had purchased a pistol capable of firing that type of ammunition. There were around 20 types of guns capable of firing that type of ammunition.[23] The defendant filed a motion to suppress the handgun found in the execution of the search warrant, which motion the trial court overruled. He argued that the warrant was insufficiently particular because police knew the caliber of firearm used in the crime, but the

---

[19] *U.S. v. Sanjar, supra* note 10, 853 F.3d at 200. See, also, *U.S. v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014) ("'warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit'"), cited by *State v. Tyler, supra* note 1.

[20] *U.S. v. Sigillito, supra* note 15, 759 F.3d at 923.

[21] *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

[22] *State v. Tyler, supra* note 1, 291 Neb. at 934, 870 N.W.2d at 130.

[23] *State v. Tyler, supra* note 1.

warrant authorized a search for "'[a]ny and all firearms.'"[24]
We rejected this argument, reasoning:

> This provision was not open-ended. It authorized police to search for firearms and companion equipment; the scope of the search was not left to the discretion of the officers. Furthermore, the nature of the activity under investigation justifies its scope. Police were investigating a murder performed with a gun. They learned from the crime lab that about 20 guns were capable of firing the bullets recovered from the scene. The provision was sufficiently particular.[25]

Here, we reject Baker's argument that the provision of the search warrant authorizing police to search for "[a]ny and all" firearms was insufficiently particular. Importantly, Baker does not argue that probable cause was lacking for police to search for any and all firearms. Thus, we need not address whether there was probable cause to authorize a search for any and all firearms, including handguns and shotguns, where the crime scene evidence (the shell casings found and the shot-up Crown Victoria) and the security camera footage indicated that the gun used was likely a rifle. Rather, Baker argues that the warrant was lacking in particularity.

The search warrant was sufficiently particular because it told police with reasonable clarity which items to search for and seize. It did not authorize a "'fishing expedition[]'" through Baker's residence.[26] Even without specifying a particular caliber of firearm, the description of "[a]ny and all" firearms, followed by the exemplary list of types of firearms, was "'sufficiently definite to enable the searching officers to identify the property authorized to be seized.'"[27] Police were

---

[24] *Id.* at 934, 870 N.W.2d at 130

[25] *Id.* at 935, 870 N.W.2d at 131.

[26] See *State v. Sprunger, supra* note 9, 283 Neb. at 539, 811 N.W.2d at 243.

[27] See *U.S. v. Sigillito, supra* note 15, 759 F.3d at 923.

not given open-ended discretion as to which items they could search for and seize.

Because the provision of the search warrant authorizing police to search for and seize "[a]ny and all" firearms did not run afoul of the particularity requirement of the U.S. and Nebraska Constitutions, the trial court properly denied Baker's motion to suppress. Because the search warrant was valid, we need not address whether the DNA swabs obtained from the rifle found in the search are "'fruit of the poisonous tree.'"[28]

### HEARSAY AND RULE 403: JAIL TELEPHONE CALL

Baker claims that the trial court improperly admitted a recorded telephone call between him and Clark, his ex-girlfriend, that he made from jail. He argues that the trial court erred in admitting the call over his hearsay and rule 403 objections.

At Baker's trial, the court allowed the prosecution to play for the jury a recorded telephone call between Baker and Clark. Baker objected to the admission of Clark's statements in the telephone conversation on hearsay and rule 403 grounds. The trial court gave a limiting instruction to the jury that Clark's statements were admissible for the limited purpose of providing context to Baker's statements and should not be considered for the truth of the matter asserted.

Baker asserts that the correct analytical framework for reviewing the admissibility of Clark's statements is the framework set forth in *State v. Rocha*.[29] Because this case similarly involves the admissibility of statements made by a third party admitted for the limited purpose of providing context to the statements of a party, we agree.

In *Rocha*, we considered the admissibility of statements made by a police officer within a recorded police interview with the defendant, in which the officer made statements

---

[28] See brief for appellant at 22.

[29] *State v. Rocha, supra* note 2.

regarding the guilt and veracity of the defendant. A video recording of the interview was played for the jury, and the trial court gave a limiting instruction explaining that the officer's statements were interrogation techniques and that the statements should not be considered as substantive evidence or considered in any way when evaluating the defendant's guilt or the truth of any of his statements.

In *Rocha*, we elected to analyze such statements under the normal rules of evidence rather than to adopt a special rule for such evidence.[30] In doing so, we advised courts that when considering the admissibility of such statements, they must "do more than offer 'a mechanical recitation'" that the third party's statements are necessary to provide context.[31]

First, we said that absent some ground for admissibility as substantive evidence, such third party, out-of-court statements are not admissible to prove the truth of the matter asserted in the statements, for this would violate the hearsay rule.[32] And we said that "[u]pon request, a defendant is entitled to a limiting instruction that such [third-party] statements are to be considered only for the [limited] permissible purpose of providing context to the defendant's statements."[33]

[9,10] Next, we said that a court must consider whether the statement made by a third party admitted to give context to a party's statement is relevant. To evaluate the relevance of the third party's statement for the purpose of providing context, a court must compare the probative value of the defendant's statement with and without the added context; if the third-party statement makes the defendant's statement any more probative, the third-party statement is itself relevant.[34]

---

[30] See *People v. Musser*, 494 Mich. 337, 835 N.W.2d 319 (2013).

[31] *State v. Rocha, supra* note 2, 295 Neb. at 738, 890 N.W.2d at 198.

[32] *State v. Rocha, supra* note 2; Neb. Evid. R. 801 and 802, Neb. Rev. Stat. §§ 27-801 and 27-802 (Reissue 2016).

[33] *State v. Rocha, supra* note 2, 295 Neb. at 741, 890 N.W.2d at 199.

[34] *Id.*

We then said that a court must consider whether the third-party statement runs afoul of rule 403.[35] This rule allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[36] In determining whether the danger of unfair prejudice substantially outweighed the probative value in *Rocha*, we looked to several considerations.[37] We considered the fact that the third-party statements were made by a police officer, which could induce improper reliance by the jury because the statements carried the "'imprimatur of the government.'"[38] But we also considered the fact that a limiting instruction was given in the case, which mitigated the risk of improper reliance on the officer's statements. We concluded that while the case was a "close call" and "approache[d] the line," the trial court's admission of the statements did not rise to the level of an abuse of discretion.[39]

Here, Clark's statements to Baker are plainly relevant. Baker's statements have far more probative value when considered in the context of Clark's statements to which he is responding. For example, Baker's statement "Do they?" is far more probative when considered in light of Clark's preceding statement, "[T]hey have pictures of you at the crime scene." Baker's statement "Yeah" is far more probative with the context of Clark's preceding statement, "[I]t's not like you woke up that morning and was like, 'hey, let's go kill these mother fuckers' and planned it all out. It was all, it was either your life or their life. Right?" Clark's statements are intertwined with Baker's responses throughout the conversation. Plainly, her

---

[35] *State v. Rocha, supra* note 2; § 27-403.

[36] § 27-403.

[37] *State v. Rocha, supra* note 2.

[38] *Id.* at 743, 890 N.W.2d at 201.

[39] *Id.* at 744, 890 N.W.2d at 201.

statements have probative value for the purpose of providing context to Baker's own statements, which could not be fully understood standing alone.

And the trial court did not abuse its discretion in concluding that the probative value of Clark's statements was not substantially outweighed by the risk of unfair prejudice under rule 403. Certainly, Clark's statements carried with them some risk of prejudice. She made comments about police having pictures of Baker from social media, having pictures of him at the crime scene and identifying him based on his clothing, and even suggesting that he committed the killings but that they were not premeditated. But the evidence identifying Baker at the crime scene from the security camera footage based on his clothing was presented to the jury; Clark's comments on this evidence were not *unfairly* prejudicial. And unlike the facts in *Rocha*, the statements were not made by a police officer or other official with the "'imprimatur of the government'"; nor did they question the veracity of a defendant's claims to innocence.[40]

[11] And when analyzing evidence under rule 403, courts not only consider the risk of unfair prejudice or other dangers the evidence carries, but weigh those dangers against the probative value of the evidence, determining whether the former substantially outweighs the latter.[41] Here, Clark's statements carried substantial probative value by providing necessary context to Baker's statements. Even Clark's statement suggesting that Baker committed but did not plan the killings provides irreplaceable context to Baker's responses: "Yeah" and "Aww, shit man. This shit [is] cray cray." Baker's effective admission to, or at least lack of denial of, committing the killings cannot be understood without the context of Clark's preceding statements. Clark's statements here carry far more probative weight than those made by the officer in *Rocha*,

---

[40] *Id.* at 743, 890 N.W.2d at 201.

[41] *State v. Rocha, supra* note 2.

many of which bore a tenuous connection to the defendant's statements.

Thus, Clark's statements carried both some risk of unfair prejudice and significant probative value. Whether the former substantially outweighed the latter is a question left to the discretion of the trial court. We conclude that the trial court did not abuse its discretion by determining that the admission of the telephone call, including Clark's statements, did not violate rule 403 and overruling Baker's objections to its admission.

## CONCLUSION

The search warrant that authorized police to search for and seize any and all firearms in Baker's residence did not violate the constitutional particularity requirement. The warrant was sufficiently definite to enable police to know what items they were authorized to search for and seize. And while the admission of statements made by Clark, Baker's ex-girlfriend, as part of the recorded telephone conversation between her and Baker carried some risk of prejudice, the trial court did not abuse its discretion in concluding that the risk of unfair prejudice did not substantially outweigh the probative value of those statements to give necessary context to Baker's statements. We affirm.

AFFIRMED.