Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/09/2019 08:07 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
MICHAEL E. GOYNES, JR., APPELLANT.
___ N.W.2d ___

Filed May 17, 2019.    No. S-18-135.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Pretrial Procedure: Trial: Evidence: Appeal and Error.** Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review.

3. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.** The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.

4. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.

5. **____: ____: ____: ____.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, the question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

6. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.

7. **Search Warrants: Affidavits: Evidence: Appeal and Error.** In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.

8. **Search Warrants: Probable Cause.** The particularity requirement for search warrants is distinct from, but closely related to, the requirement that a warrant be supported by probable cause.

9. **Search Warrants.** A purpose of the particularity requirement for a search warrant is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact.

10. **Constitutional Law: Search Warrants: Police Officers and Sheriffs.** To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized. The degree of specificity required depends on the circumstances of the case and on the type of items involved.

11. **Search Warrants: Probable Cause: Evidence.** A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.

12. **Search and Seizure: Search Warrants: Probable Cause.** A warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.

13. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Matthew J. Miller for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

FUNKE, J.

Michael E. Goynes, Jr., appeals his convictions of murder in the first degree, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person. On appeal, Goynes challenges the district court's failure to suppress cell phone data content acquired through the execution of a search warrant. Goynes claims the warrant was unsupported by probable cause and insufficiently particular. The State, in turn, argues that the warrant was supported by probable cause and sufficiently particular and that the officers who executed the warrant acted in good faith. For the reasons set forth herein, we affirm.

## I. BACKGROUND

At 4:25 p.m. on April 25, 2016, Omaha Police Department officers responded to a report of shots fired at an apartment complex in Omaha, Nebraska. In front of the complex, the officers found Barbara Williams on the ground in a pool of blood. Williams had been shot in the chest, and paramedics pronounced her dead at the scene.

As a result of a subsequent investigation, officers identified Goynes as a suspect and took him into custody on April 30, 2016. Goynes had an "LG Tribute 5" cell phone in his possession when he was arrested. Det. Larry Cahill submitted an application for a search warrant authorizing examination of the cell phone and the extraction of electronically stored information. In the supporting affidavit, Cahill stated his belief that data from the cell phone would assist him in determining the course of events regarding the homicide investigation of Williams.

The factual basis Cahill provided in his affidavit explained that on Monday, April 25, 2016, officers responded to the shooting at the apartment complex. Upon their arrival, the officers observed Williams deceased in front of the complex with an apparent gunshot wound to her torso. The officers then undertook an investigation wherein several potential witnesses to the shooting were interviewed.

The affidavit stated that around 4:20 p.m. on April 25, 2016, a witness heard approximately four or five gunshots and observed a white, four-door sedan parked just east of the north entrance facing the apartments. The witness then observed a black male wearing a white T-shirt, gray pants, and a dark-colored hat holding a handgun in his right hand and walking toward the sedan. The black male got into the driver's side of the sedan, which left the area quickly, traveling east on Boyd Street toward North 48th Street.

This account was supported by video described in the affidavit. In the video, which showed various views of the front of the apartment complex, investigators observed a white, four-door sedan drive past the front of the complex's entrance, where officers later located Williams, and park in a spot east of that entrance. The officers observed an unidentified party travel from where the sedan was parked, approach the elevated stoop of the entrance, and return back to the sedan's location. The video then showed the sedan leaving, traveling east on Boyd Street.

Cahill's affidavit described interviews occurring on April 29, 2016, with two other potential witnesses, George Taylor and Saville Hawthorne, who claimed to know the identity of the suspect.

Taylor's interview provided that Taylor and Hawthorne drove to a parking space across the street from the apartment complex at 4 p.m. on April 25, 2016. Taylor described that Hawthorne and Williams were friends and that after Taylor parked his vehicle facing the entrance of the complex, Hawthorne briefly went to talk to Williams before returning to the vehicle. Once Hawthorne returned to the vehicle, Taylor observed a white, four-door sedan pull into a parking spot just east of the apartment entrance where Williams was located. Taylor stated he observed a black male wearing a white T-shirt, dark pants, and a black hat exit the sedan, possibly from the back seat. Taylor indicated that he saw additional parties inside the white sedan, but that those individuals did

not exit the sedan. Upon exiting the sedan, the black male began walking toward the elevated stoop where Williams was sitting. Taylor identified the man as Goynes, also known as "'Gang Bang,'" explaining that Goynes is Hawthorne's cousin and a known gang member. Taylor described that Goynes then began firing a black handgun toward the stoop in front of the entrance. Taylor stated that two men, whom he knew as "'Action'" and "'Stay Ready,'" were sitting on the elevated stoop near Williams and that he believed Goynes was shooting at these men. Taylor stated he watched Goynes fire approximately 10 times, firing all the way up to the entryway stairs and toward where he saw "'Action'" and "'Stay Ready'" running. Taylor then sought cover and did not see Goynes or the sedan leave.

In Hawthorne's interview, she stated that she rode to the apartment complex with Taylor and that they parked facing the entrance of the complex. After noticing several friends, including Williams, sitting on the stoop in front of the entrance, she went over and "sat with them for a couple minutes." Hawthorne was then called away and left the stoop to return to the vehicle, where she sat in the front passenger seat. While in the vehicle, Hawthorne observed a white, four-door sedan approach and park on the east side of the entrance and saw a black male exit the sedan from the rear driver's side seat. The man that exited the sedan, whom Hawthorne identified as her cousin Goynes, walked toward the stoop and pulled out a black handgun from his waist which he used to shoot toward the stoop at least 10 times. Hawthorne believed Goynes was shooting at two men on the stoop she identified as "'Action'" and "'Stay Ready,'" whom she observed fled into the courtyard of the apartment complex. Hawthorne explained that Goynes ran up the stairs of the stoop and continued to shoot toward the courtyard before heading back and getting into the sedan. Hawthorne described that the sedan left the scene eastbound toward 48th Street. Hawthorne clarified she was "100% sure" Goynes was the shooter and was able to positively

identify him from a photographic lineup, as well as "'Action'" and "'Stay Ready.'"

Cahill asserted in his affidavit that there was data on the cell phone related to the offense and listed the areas in which that data could be found. Cahill supported his assertion by explaining:

> From training, experience and research Affiant Officer is aware that the data on cell phones can provide invaluable insight for criminal investigations. Cell phones are used for communication, access to information, socialization, research, entertainment, shopping and other functionality. In addition to personal use, cell phones are often used as tools in criminal activity. Affiant Officer is aware of numerous instances where cell phones were used by participants in crimes to communicate via voice and text messaging, occasions when they took photographs of themselves with weapons and/or illegal narcotics, times when they created videos of their criminal activity and instances when the Internet was used to research crimes they participated in, just to name a few. As such a cell phone can serve both as an instrument for committing a crime, as well as a storage medium for evidence of the crime.

> Cell phone data can assist investigators in determining the culpability of participants in criminal investigations. This is because the data can potentially provide a wealth of information that can assist in determining the motivation, method and participants involved in an incident. Information on the devices can provide invaluable insight to the who, what, when, where and why an incident occurred.

Cahill continued by explaining the kind of information the listed types of cell phone data could provide to investigators.

The county court found probable cause to support the warrant and granted Cahill's application. In the warrant, the court identified the warrant was in relation to the Williams'

homicide and authorized the search of the cell phone data described in the affidavit, including: cell phone information and configurations; user account information; call logs; contact lists; short and multimedia messaging service messages; chat and instant messages; email messages; installed applications and their corresponding data; media files such as images, videos, audio, and document files; internet browsing history; cell tower connections; global positioning system fixes, waypoints, routes, and tracks; Wi-Fi, Bluetooth, and synchronization connection history; memorandums and notes; user dictionary; and calendar information.

A subsequent application seeking the cell phone records from Goynes' cell phone provider was also granted but is not at issue in the instant appeal.

Goynes was charged with murder in the first degree, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person.

Prior to trial, Goynes filed a motion to suppress all evidence obtained from the search of his cell phone records for the reason that such search was conducted in violation of the 4th, 5th, and 14th Amendments to the U.S. Constitution and article I, §§ 3, 7, 11, and 12 of the Nebraska Constitution. A hearing was held on the motion, and the district court clarified with Goynes that his motion was for both the cell phone records and the contents of his cell phone. The search warrant applications, affidavits, warrants, and other evidence were received as exhibits for the motion to suppress.

Cahill testified during the hearing and explained the process of applying for the warrants and that he relied on the warrants when he performed the search of the cell phone, its data, and its records. On cross-examination, he agreed that the witnesses described in the affidavits did not provide any information or evidence that the shooter was using a cell phone in the minutes immediately preceding or after the shooting, that the shooter communicated about the shooting over his cell phone, that the shooter took photographs or video of the

shooting, or that the shooter communicated about the shooting on social media.

The court overruled Goynes' motion and found the warrant for the content of Goynes' cell phone was supported by probable cause provided in the affidavit. The court also found the warrant was sufficiently particular concerning the data to be searched, the warrant was not overly broad, and the officers exercised good faith in performing the search.

The case continued to a jury trial. Cahill testified for the State, and during that testimony, the State offered Goynes' cell phone and a compact disc containing data extracted from the cell phone. Goynes renewed his objection to these exhibits based upon his motion to suppress, and the court overruled it.

The State also called an investigator with the Omaha Police Department's digital forensics squad as a witness. During his testimony, the State offered printed copies of the cell phone data detailing activity and internet searches that Goynes performed on his cell phone between April 25 and 30, 2016. The data contained in these printouts were select datasets of the information contained on the compact disc and Goynes' cell phone which were previously offered into evidence during Cahill's testimony. Goynes did not specifically object when these exhibits were presented.

According to the data contained in these exhibits, Goynes used the internet throughout the morning and early afternoon on April 25, 2016. Notably, Goynes repeatedly accessed Facebook between 3:38 and 4:19 p.m. and then stopped. There were no cell phone calls, text messages, or internet browsing history between 4:19 and 5:08 p.m. that day. At 5:08 p.m., Goynes again began accessing Facebook and, at 5:10 p.m., visited the website of a local television news station and viewed an article about the shooting before returning to Facebook. Later that day, Goynes again accessed Facebook and, at 9:15 p.m., visited the website of another local television news station and viewed another article about the shooting before

returning to Facebook. On April 30, the date Goynes turned himself in to police, the cell phone was again used to access an article related to the shooting. On that same day between the hours of 12:42 and 7:40 a.m., the cell phone was used to search various websites using the name "Michael Goynes," or variations of that name, as the search term.

At the conclusion of the trial, the jury returned a verdict finding Goynes guilty of all counts. Goynes was sentenced to life imprisonment for murder in the first degree, 45 to 50 years' imprisonment for use of a deadly weapon (firearm) to commit a felony, and 20 to 25 years' imprisonment for possession of a deadly weapon by a prohibited person.

## II. ASSIGNMENT OF ERROR

Goynes assigns, restated, that the district court erred in failing to suppress cell phone data content acquired through the execution of a warrant that was unsupported by probable cause and insufficiently particular.

## III. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[1] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[2]

## IV. ANALYSIS

[2,3] We initially note Goynes failed to object to the printouts of the cell phone data offered during the digital forensics investigator's trial testimony. Where there has been a pretrial ruling regarding the admissibility of evidence, a party must

---

[1] *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015).

[2] *Id.*

make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review.[3] The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.[4] Therefore, Goynes' assignments as they relate to the printouts were waived and not adequately preserved for appellate review.

However, Goynes did object to the introduction of the cell phone and the compact disc containing the cell phone data. As such, and because we find the warrant met the probable cause and particularity requirements of the Fourth Amendment and article I, § 7, we address the substance of Goynes' claims on the validity of the warrant, even though he failed to object to the exhibits containing the printed data from the cell phone and failed to preserve a challenge to those exhibits for review.

### 1. Validity of Search Warrant

The Fourth Amendment provides that warrants may not be granted "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Nebraska Constitution, under article I, § 7, similarly provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

### (a) Probable Cause

[4-7] In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.[5] The question is whether, under the totality of the circumstances

---

[3] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[4] *Id.*

[5] *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013).

illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[6] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.[7] In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.[8]

In the affidavit executed in support of the search warrant application, Cahill provided observations from officers investigating the scene of the shooting, summaries of interviews conducted of witnesses to the shooting, and a description of video showing events surrounding the shooting. Specifically, Taylor and Hawthorne gave eyewitness accounts of the shooting and identified Goynes as the shooter. Both Taylor and Hawthorne were acquainted with Goynes prior to the act, as Hawthorne and Goynes were cousins. Hawthorne picked Goynes out of a photographic lineup as well as the two men Taylor and Hawthorne believed were the targets of the shooting. Additionally, their accounts were supported by an eyewitness account, the video of the white sedan arriving and leaving the scene, and the observations of the officers upon arriving at the scene.

Goynes had the cell phone in his possession when he was arrested, and Cahill, through his training and experience, described why the cell phone likely had information relevant to the shooting investigation. Cahill explained that cell phone data provides insight for criminal investigations in that cell phones are used for communication, access to information, socialization, research, entertainment, shopping, and other functionality

---

[6] *Id.*

[7] *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012).

[8] *State v. Hidalgo*, 296 Neb. 912, 896 N.W.2d 148 (2017).

and that these uses are often found to be tools in criminal activity. Cahill further explained that the data from cell phones can provide information on the motivation, method, and participants involved in a crime. Cahill stated that he was aware of numerous instances where cell phones were used by participants in crimes to communicate through voice and text messaging, take photographs of themselves with weapons or illegal narcotics, create videos of their criminal activity, and research crimes in which they participated. Cahill opined that these uses demonstrate a cell phone can serve as both an instrument for committing a crime and as a storage medium for evidence of the crime.

The factual basis provided in Cahill's affidavit is similar to the one described in *State v. Henderson*.[9] In that case, two men were shot and two men were seen running from the scene. The affidavits provided to the county court established that there was a fair probability that the defendant, Tillman Henderson, was involved in the shootings and that he had a cell phone in his possession when he was taken into custody shortly after the shootings. The officer seeking the warrant also provided language that, in his experience as a detective, he knew suspects used cell phones to communicate about shootings they have been involved in before, during, and after the shootings and that such communications could be through, inter alia, voice or text messages or social media. In determining that the affidavits provided the county court a substantial basis to find probable cause existed to search the cell phone, we found that it is reasonable to infer that Henderson's cell phone was used to communicate with others regarding the shootings before, during, or after they occurred, because Henderson was working with at least one other person to commit the shootings.[10]

In the instant case, Goynes had the cell phone in his possession at the time he was taken into custody and the affidavit

---

[9] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[10] *Id.*

established it was a fair probability that Goynes had committed the shooting. There were additionally witness accounts summarized in the affidavit that described Goynes' committing the shooting with the aid of one or more other people, and Cahill described how, in his experience as an investigator, individuals who committed similar crimes commonly communicate, research, record, and perform other operations on their cell phones that would amount to evidence of the crime. Although the content of the affidavit pertaining to how suspects use cell phones standing alone may not always be sufficient probable cause, when considered with all of the facts recited above, as we determined in *Henderson*, the affidavit provided a substantial basis to find probable cause existed to search the cell phone data.

### (b) Particularity

[8,9] In addition to the requirement of probable cause, the Fourth Amendment and article I, § 7, contain a particularity requirement describing the place to be searched and the persons or things to be seized. The particularity requirement for search warrants is distinct from, but closely related to, the requirement that a warrant be supported by probable cause.[11] A purpose of the particularity requirement for a search warrant is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact.[12]

[10-12] To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.[13] The degree of specificity required depends on the circumstances of the case and on the type of items involved.[14]

---

[11] *State v. Baker*, 298 Neb. 216, 903 N.W.2d 469 (2017).

[12] *Sprunger, supra* note 7.

[13] *Baker, supra* note 11. See, also, *U.S. v. Sigillito*, 759 F.3d 913 (8th Cir. 2014).

[14] See, *Sigillito, supra* note 13; *Baker, supra* note 11.

A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.[15] As relevant to the instant case, a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.[16]

Here, as detailed in the previous section, Cahill's affidavit provided probable cause that Goynes committed the shooting and that he was aided by others. When Goynes was taken into custody, he had the cell phone in his possession. Cahill explained cell phone data provides insight for criminal investigations on the motivation, method, and participants in that cell phones are used for communication, access to information, socialization, research, entertainment, shopping, and other functionality. Accordingly, Cahill listed several types of data he was seeking to search through the warrant and how the data was relevant to the investigation. These types of data included the following: cell phone information, configurations, calendar events, notes, and user account information which could identify who owns or was using a cell phone; call logs which could establish familiarity between people involved and timelines of an incident; short and multimedia messaging service messages, chat and instant messages, and emails which could provide insight to establish an individual's level of culpability and knowledge of the incident; installed application data which could aid in determining a user's historical geographic location and demonstrate the user's association with investigated people, location, and events; media files such as images, videos, audio, and documents which could provide

---

[15] *Baker, supra* note 11.

[16] See *Henderson, supra* note 9.

times and locations, as well as firsthand documentation of the incident; internet browsing history which could demonstrate the planning, desire, and participation in a crime; cell tower connections, global positioning system data, Wi-Fi, Bluetooth, and synchronization logs which could provide information on location in relation to the incident; and user dictionary information which could demonstrate familiarity with the crime being investigated.

The county court used the list sought by Cahill and restated these types of data in the warrant as the areas permitted to be searched. From the facts surrounding the shooting and Cahill's explanation of the areas in the cell phone he was seeking to search, the court had a substantial basis to find probable cause that evidence relevant to the shooting was accessible data in the areas listed.

Goynes argues the scope of the search authorized in the warrant was too broad and was similar to warrants we determined did not meet the particularity requirement in *Henderson*. Goynes contends that the areas which the warrant permitted to be searched encompassed the entirety of the data contained within the cell phone and that *Henderson* condemns the allowance of such a search of "'any and all'" information stored on a cell phone.[17]

However, *Henderson* does not stand for the rule that a search of a cell phone cannot be expansive; instead, we held that the unlimited search of the cell phone in that case did not align with the justifying probable cause.[18] The *Henderson* warrants failed to refer to a specific crime being investigated. In addition, while the warrants in *Henderson* listed types of cell phone data to search, such as calls and text messages, they also authorized a search of "'any other information that can be gained from the internal components and/or memory

---

[17] Brief for appellant at 25.

[18] *Henderson, supra* note 9.

Cards.'"[19] In finding the warrants were insufficiently particular, we noted the privacy interests arising from a cell phone's immense storage capacity, ability to store many different types of information, functionality as a digital record of nearly every aspect of the owner's life, and ability to access data located elsewhere.[20] We concluded that a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.[21] We further held that by including such a catchall phrase as "'any other information,'" a warrant fails to set parameters for the search of this substantial device and limit the search to only that content that is related to the probable cause justifying the search.[22]

Unlike *Henderson*, the warrant in the instant case did identify it was for the investigation for the homicide of Williams. The warrant also did not contain such unqualified language that would permit the search of the cell phone for "'any other information.'"[23] Instead, the warrant listed specific areas to be searched within the cell phone. These areas were described in the affidavit, along with a description of the information they held which would be relevant to the investigation.

The affidavit authored by Cahill set forth sufficient probable cause to justify the search of the cell phone and sufficient particularity to identify the locations on the cell phone to be searched and the content to be seized. As a result, the court had a substantial basis for finding that probable cause existed to issue a warrant for these areas, and the warrant limited the scope in listing specific areas to be searched for evidence relevant to the homicide of Williams.

---

[19] *Id*. at 277, 854 N.W.2d at 625.

[20] *Henderson, supra* note 9.

[21] *Id.*

[22] *Id*. at 290, 854 N.W.2d at 633.

[23] See *id*.

## 2. Good Faith Exception

[13] Because we conclude the affidavit contained sufficient facts to establish probable cause for the issuance of a search warrant, we need not address whether the good faith exception to the exclusionary rule applies. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[24]

## V. CONCLUSION

For the reasons stated above, we conclude the search warrant at issue was supported by probable cause and met the particularity requirement of the Fourth Amendment and article I, § 7. Accordingly, the district court did not err in declining to suppress evidence obtained through the execution of the warrant.

Affirmed.

---

[24] *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).