IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HARRIS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MARRICKIO D. HARRIS.

Filed October 20, 2020.    No. A-19-973.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Timothy M. Eppler for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, BISHOP and WELCH, Judges.

MOORE, Judge.

I. INTRODUCTION

Marrickio D. Harris appeals from his convictions in the district court for Lancaster County for possession with intent to deliver 10 to 27 grams of cocaine; possession with intent to deliver cocaine base; and possession of money used in violation of Neb. Rev. Stat. § 28-416 (Cum. Supp. 2018). Following his jury trial convictions, the court found him to be a habitual criminal. The court imposed sentences totaling 15 to 20 years' imprisonment. On appeal, Harris challenges the court's denial of his request to conduct his own defense, threat to revoke his bond, allowing the State to file an amended information, denial of a proposed jury instruction, and denial of his motion for new trial. He also asserts that he received ineffective assistance of trial counsel in various regards. For the reasons set forth herein, we affirm.

- 1 -

## II. BACKGROUND

### 1. CHARGES

On December 6, 2018, the State filed an information in the district court, charging Harris with possession with intent to deliver 10 to 27 grams of cocaine in violation of § 28-416, a Class ID felony; possession with intent to deliver cocaine base in violation of § 28-416, a Class II felony; and possession of money used in violation of § 28-416, a Class IV felony. The charged crimes were alleged to have occurred on or about August 18, 2018.

### 2. PRETRIAL PROCEEDINGS

#### (a) Arraignment and Harris' Pro Se Motions

On December 12, 2018, Harris appeared pro se for an arraignment hearing. His standby counsel also appeared. (This case originated in county court before being bound over to district court; standby counsel was appointed during those proceedings). Harris informed the district court that he had represented himself in "the kangaroo court . . . the county court," where his motions kept "getting denied for some odd reason," and that "[t]hey forced an attorney on [him]." During the ensuing discussion, the court explained that standby counsel was appointed "for the benefit of the court primarily" and advised Harris of his right to assistance of counsel, while Harris insisted on his right and desire to represent himself. Further discussion between the court, Harris, his standby counsel, and the prosecutor, showed that Harris would be filing some motions to dismiss, and arraignment was continued to allow for those motions to be filed and heard.

On December 11, 2018, Harris filed a pro se motion to dismiss the case for lack of both personal and subject matter jurisdiction. In the motion, Harris referred to himself as "Flesh and Blood Human Being marrickio d harris," and he sought dismissal of the case because he did not have a contractual relationship with either the State or Lancaster County and because he "did not commit a law crime or damage any person or property" on the date in question. He also sought dismissal for failure to state a claim for relief. In support of his motion, he cited certain federal rules of civil procedure, the "common law head-of-state doctrine," and the "requirement of exhaustion of remedies in the Torture Victims Protection Act."

The district court heard Harris' motion to dismiss on January 16, 2019, and it denied his motion before proceeding with arraignment. During the arraignment portion of the hearing, Harris asked the court whether the case was a civil or criminal action, and the court told him that it was a criminal case. Harris then asked whether the court's "criminal jurisdiction" was based on "Admiralty or . . . military tribunal" jurisdiction. The court informed Harris that if he had a legal question he could talk to his standby counsel, but Harris insisted that he was in court to represent himself and that he was asking the court questions because he was "just trying to get an understanding."

At the district court's direction, the prosecutor read the charges and informed Harris of the possible penalties. When asked whether he understood the charges and possible penalties, Harris did not respond. Upon further inquiry by the court, Harris still declined to respond and stated, "I don't understand any of this, ma'am, until I'm getting my questions answered." The court expressed concern about Harris continuing to represent himself and asked whether he would

reconsider being represented by counsel, given the "very serious charges" he was facing, but Harris declined. He also declined to enter a plea to the charges. Accordingly, the court noted that Harris was "standing mute" and entered pleas of not guilty on his behalf. Harris objected to the court doing so, asserting that the court was unlawfully "practicing law from the bench," and he continued to argue with the judge until the hearing adjourned.

On March 5, 2019, Harris filed a motion to withdraw plea, alleging that the district court had unlawfully practiced law from the bench by entering a plea of not guilty on his behalf. Harris asked that his plea be withdrawn and that he "be allowed to make [his] own plea once [he] know[s] the nature and cause of the case pending against [him]." He also filed two additional motions to dismiss for lack of jurisdiction. One of these motions to dismiss alleged that the court lacked jurisdiction to proceed against him under "Admiralty Jurisdiction as a Military Tribunal under Article 1 Section 8 Clause 17 of the U.S. constitution" because there was "no valid International Maritime contract in dispute." In the other motion to dismiss, Harris alleged that the court lacked "Common Law Jurisdiction" over him because he "did not commit a common law crime" or "damage any person or property." The certificates of service for these motions noted that they were signed by Harris, and identified him as "Flesh and Blood Human Being."

The district court heard Harris' three motions on March 6, 2019. This hearing proceeded much as the previous hearing with Harris insisting that the court answer his questions with respect to jurisdiction and the court informing him that it could not provide legal advice but that his standby counsel could answer such questions. At one point, Harris stated:

> I . . . just want the questions to be answered. I put it towards the right people. I filed the paperwork. No one seems to answer me. Everyone seems to keep going over the fact of the questions I need answered before I can continue to do any type of things with this case.
>
> Other than that, I'm lost. I don't know anything. I don't understand why I'm here and why -- because I'm here under duress, under stress. I'm here by force. I was told that if I didn't come here I would be arrested. That's why I'm actually here.

The district court again stated that it would not provide Harris with legal advice and then overruled his motions to dismiss and the motion to withdraw plea and set the case for a jury trial. Harris objected to the court doing so and continued to argue that the court lacked jurisdiction. In doing so, he stated, among other things:

> I'm . . . in a business place, where people conduct business. I haven't forced any contract. I haven't entered in any contract. And I'm also here under . . . I'm also here without prejudice purswayant [sic] to UCC 1-308, which also means [] on record I reserve my rights to not to be compelled to perform under any contract, commercial agreement or bankruptcy that I did not enter knowingly, voluntarily and intentally [sic].
>
> And further most I do not and will not accept the liability of the compelled benefit of any unrevealed contract or commercial agreement or bankruptcy.

After the court acknowledged that Harris had "made [his] record," it ordered him to appear for trial on April 3, 2019, and informed him that discovery materials would be available to him at the

county attorney's office. Harris continued to argue with the court about the need for answers to his jurisdictional questions until the hearing was adjourned.

Harris filed the same three motions (seeking to withdraw plea and alleging lack of jurisdiction) again on March 26, 2019, and the court addressed the refiled motions on April 3 prior to the start of the scheduled jury trial. In support of his motions, Harris presented similar arguments as before. He argued that the district court had entered a plea of not guilty without his consent, that he "never formed a contract with you guys," and that he had never been provided an answer as to "what kind of criminal tort" was at issue. At one point, he stated, "I don't know anything about this. You are forcing things right now that I don't know anything about. I'm not prepared because I don't know what jurisdiction I'm under. You refused to tell me."

Given Harris' stated confusion, the district court again expressed grave concern about Harris' decision to represent himself. Harris expressed dissatisfaction with communications from his standby counsel, and the court explained that standby counsel was to assist if Harris had questions but was not obligated to contact Harris if Harris did not reach out to him. The court again advised Harris of his right to counsel and asked if he was waiving that right. Harris responded, "I'm not waiving no rights I'm given," and asserted his right to represent himself. The court agreed that Harris had the right to do so and stated, "I'm asking you if that's the choice you are making." Rather than answering the court's question, Harris stated, "No ma'am. I would not -- or I can not [sic] answer a question I don't know the answer to." When the court again asked Harris if he was representing himself, he stated, "I'm here to -- in myself, in my being." The court asked specifically if Harris wanted standby counsel to represent him, and Harris again asserted that his standby counsel was not helpful. The court then asked, "I take it you are going to proceed representing yourself; is that correct?" Harris responded, "All of your questions I answered. Other than that, I don't know what's going on here." After further discussion, during which the court explained that while Harris had the right to appointed counsel if he was indigent, just not appointed counsel of his own choosing, the court asked Harris if he wanted to represent himself rather than have his standby counsel act as his counsel. In response, Harris stated, "I don't know. I don't know."

The district court then explained the trial process, and throughout the court's explanation, Harris repeatedly expressed his lack of understanding. At that point, the court noted its concerns about Harris' competency, stated that it did not feel that it could allow Harris to continue representing himself, and appointed the standby counsel to represent Harris for the duration of the case. The court asked if there were any other "housekeeping matters" to address, and the prosecutor expressed concern about continuing with trial given Harris' apparent lack of communication with his now-appointed counsel. In light of Harris' responses to questions that morning, the prosecutor made an oral motion to have Harris examined for competency, which Harris' counsel agreed was appropriate. Accordingly, the court ordered a competency evaluation, revoked Harris' bond "to effectuate that in its most efficient fashion," and continued the case, pending the results of the evaluation.

(b) Competency Evaluation and Hearing

Harris was examined by a psychiatrist on April 5, 2019; his report was received into evidence at the competency hearing held on April 11. During the examination, Harris expressed

an understanding of the charges against him, the possible penalties, and both the plea and trial process. The psychiatrist found Harris to be "affable, cooperative, friendly, and talkative" and stated that he "voices an understanding of the reason for this examination." The psychiatrist found no evidence of hallucinations, delusional thought, or depression and only minimal anxiety. The psychiatrist concluded:

> This man does not want to be punished undeservedly. He has good contact with reality and the minimum level of intelligence necessary to grasp events taking place. He has no difficulty conferring with appreciation of proceedings and giving and taking advice from his attorney in an effort to arrive at a rational defense strategy and select a sensible plea. He can testify on his own behalf if necessary. The stress of trial can be met by him without a breakdown in his rationality or judgment. He can follow testimony reasonably well. He has established good rapport with counsel and can answer questions in a logical goal-directed fashion. He has a good understanding of the function of the several court officials and of court proceedings.

> This man has sufficient mental capacity to appreciate his presence in relation to time, place, and things and possesses the elementary mental processes such that he understands that he is in a court of law, charged with criminal offenses. As such, to a reasonable degree of medical certainty, this man has the capacity to stand trial.

After receiving the psychiatrist's report into evidence, the district court found Harris competent to stand trial and scheduled trial. At the request of Harris' counsel, the court reinstated Harris' bond.

### (c) Counsel's Pretrial Motions to Withdraw

At the conclusion of the competency hearing, Harris' counsel made an oral motion, seeking permission to withdraw from the case given Harris' continued desire to represent himself. The district court denied this request. Harris' counsel subsequently filed a written motion to withdraw from the case, which was heard by the court on May 15, 2019. At this hearing, Harris' counsel argued that Harris had been found competent to stand trial and that Harris continued to want to represent himself. Harris' counsel also stated that there had been a deterioration of the attorney-client relationship, making it impossible for him to effectively represent Harris. The court denied the attorney's written motion to withdraw as counsel, and it noted a difference between a person's competency to stand trial and to represent himself, stating:

> Those are two very different things. Competency to stand trial is one; competency to represent himself in these very, very serious matters is another thing. . . . I do not find that Mr. Harris is competent to represent himself in these matters. And for that reason, I will not sustain the motion to withdraw. . . .

The court ordered Harris to appear for the scheduled trial date and directed him to "stay in close contact" with his appointed attorney.

### 3. Jury Trial

#### (a) Renewed Motion to Withdraw

The parties addressed several preliminary matters prior to the start of jury selection. First, Harris asked to address the district court, arguing that his attorney had been ineffective, alleging a lack of "cooperation" and stating that rather than doing anything Harris asked him to do, his counsel had "instructed [Harris] to follow his guidelines." Harris stated that he had "been directed on numerous occasions . . . with offers and deals from the prosecutor by this attorney," which Harris felt was "not right." Harris continued with a rather garbled explanation of his concerns until he was directed by the district court to "come up here and sit by your counsel" so that the trial could start. Harris' counsel renewed his motion to withdraw at that point, noting that Harris did not want him as his counsel and their attorney-client relationship had deteriorated to the point that the attorney could not effectively represent Harris. The court denied the renewed motion to withdraw.

#### (b) Amended Information

Next, the State asked permission to file an amended information to add a habitual criminal allegation. The prosecutor noted that the case had recently been reassigned to him due to the previous prosecutor being unavailable, and upon his review, he had determined that a habitual criminal enhancement was warranted. Harris' trial counsel objected to the filing of an amended information given that trial was about to start, and Harris also spoke up, objecting because he did not understand "what's going on" and stating, "this is being forced. I didn't ask for it [representation by appointed counsel]." After hearing the parties' arguments, the district court granted the State's request to amend the information. The court also denied a request by Harris' counsel "for service and the 24-hour waiting period," stating, "I don't believe those are applicable."

#### (c) Court's Preliminary Discussion With Harris

Also prior to jury selection, the district court had a brief discussion with Harris about the trial process. During this discussion, Harris stated that the decision to appoint counsel had violated his due process rights, that he did not understand what was going on, that no one had explained "the jurisdiction" to him, and that his attorney was "clearly not fighting for [him]." The court then stated:

> Mr. Harris, so, when we bring in the potential jury members, you will speak only through your counsel. So we can not [sic] have these outbursts and you can not [sic] speak on the record. Your counsel is speaking on your behalf. If you refuse to follow those rules, you will be removed from the courtroom, your bond will be revoked.
>
> And we will proceed with your trial; and you can participate by video.

#### (d) State's Plea Offer

Next, the prosecutor noted that the State had communicated an extension of a previous plea offer to Harris' attorney the previous day. The original plea offer was made on May 15, 2019. In exchange for Harris pleading to attempted possession with intent to deliver cocaine, a Class IIA

felony, the State would dismiss the other counts of the information, and would dismiss the charges in another case against Harris. After the current prosecutor took over the case and determined that habitual criminal charges were warranted, he extended the previous offer and also indicated that he would not file the habitual criminal charge in exchange for the one count plea. The prosecutor indicated his understanding that Harris had decided not to accept the offer, which had been extended for acceptance up until the jury was brought into the courtroom and voir dire began.

The district court asked Harris whether he understood the plea offer, and he indicated that he did not. The court attempted to explain further, and Harris insisted that he did not understand and that he was trying to "get an understanding of the jurisdiction" so that he could "properly defend" himself or "at least alert [his] attorney on the things that [Harris] need[ed] to be properly done." The discussion continued in a similar fashion until the court asked that the potential jury members be brought into the courtroom, and the trial proceeded with jury selection.

### (e) Evidence

The State's evidence included testimony from various police officers, the laboratory technician who tested the drugs in this case, and the individual who was with Harris at the time of his arrest. Photographs of the drugs and other seized items and a copy of the police body camera video of the encounter were also received in evidence. After the State rested, Harris' attorney asked the district court to dismiss the case based both on insufficient evidence and on the motions to dismiss for lack of jurisdiction filed by Harris when he was representing himself. Harris rested without presenting any evidence, and his attorney renewed the motions to dismiss, which were again denied by the court.

The evidence at trial established that on the evening of August 18, 2018, Lincoln police officers from the bike patrol unit were in a parking lot in Lincoln when they smelled an odor of marijuana that appeared to be coming from a vehicle in the parking lot. The officers approached the vehicle and identified the driver as Harris and the passenger as Rebecca Fox. The officers had Harris and Fox step out of the vehicle, confirmed that the vehicle smelled of marijuana, and observed a bottle of alcohol on the floor of the front passenger area. They searched the vehicle and found more alcohol, a small bag in the driver's side door compartment containing two joints of what appeared to be marijuana, and a larger bag on the floor of the driver's side area that contained a baggie of white powder that appeared to be cocaine, another baggie of what appeared to be cocaine base ("crack cocaine"), and another baggie of what appeared to be marijuana, as well as other drug paraphernalia.

Field tests of the suspected cocaine found that those baggies contained 16.2 grams of cocaine and 7.7 grams of cocaine base, respectively. When officers spoke with Harris and Fox about what they found, Harris said that Fox "was not involved in any manner." Fox also denied that the drugs were hers. A second vehicle in the parking lot belonged to Fox, who was cited for having an open container and released. Harris was arrested and searched, and officers found $1,660 in cash and two cell phones on his person.

One officer who participated in the search testified, based on his experience in narcotics cases, that the amount of drugs and the nature of the paraphernalia found was indicative of drug dealing. Another officer, who has been part of the Lincoln Lancaster County Drug Task Force for

17 years and is familiar with drug dealing practices, opined that the evidence seized in this case was consistent with drug dealing.

The two bags of cocaine seized from Harris' vehicle were sent in for testing at the Nebraska State Patrol Crime Lab, where their contents were confirmed as cocaine. One bag contained 15.12 grams, plus or minus .07 grams, of cocaine; the other bag contained 6.0478 grams, plus or minus .0046 grams, of cocaine base.

Fox testified that she and Harris went to a movie that night and then drove separately to the parking lot in question, where she then exited her vehicle and got into Harris' vehicle. Fox initially testified that she was seated in the passenger seat when they were contacted by police, and she agreed that the officers made contact with her and asked her to step out of the vehicle. When asked whether she then did so, she testified, "Or no. We were actually walking already out of the car." Upon further questioning, she agreed that she was "just getting out of the car when the officers approached [her]." Fox testified that the drugs found in Harris' vehicle were not hers and that she had not been aware that there were drugs in his vehicle. Harris' attorney did not cross-examine Fox.

The jury found Harris guilty of all three counts as charged, and the district court accepted the jury's verdict.

### 4. Motion for New Trial

Harris's attorney filed a motion for new trial, alleging that the district court had erred in overruling his motions for dismissal for lack of jurisdiction (including Harris' pro se motions), refusing to allow Harris to represent himself, sending Harris to jail while he underwent the competency evaluation, and failing to give Harris' proposed jury instruction regarding the definition of "possession." He also asserted that a new trial was warranted because the evidence was insufficient to support the verdicts, which were contrary to the evidence and contrary to law. During the course of the hearing on this motion, both Harris and his attorney presented arguments to the district court. The court specifically asked Harris if he wanted to comment with respect to the previous motions to dismiss for lack of jurisdiction. Harris spoke at length about his jurisdictional challenge and other concerns. The court entered an order on July 30, 2019, overruling the motion for new trial, scheduling sentencing, and arranging for Harris to inspect the presentence investigation report (PSR).

### 5. Enhancement and Sentencing

An enhancement hearing was held, and after the State presented evidence of Harris' relevant prior convictions, the district court found him to be a habitual criminal. During the hearing, Harris informed the court that he had not completed reviewing the PSR. He also argued that his attorney was not providing him with effective assistance of counsel. When asked if he wanted more time to review the PSR, he replied, "Only if I have another attorney that is willing to actually do what is needed to be [sic] and willing to go over with me properly to answer questions and actually going to fight for me because I don't feel [appointed counsel] is doing that at all." Upon the court's inquiry, he indicated that he would like a different attorney appointed because his "Sixth Amendment right ha[d] been taken away from [him] on [his] pro se status," and he

explained that his current attorney had shown a lack of concern when Harris pointed out inaccuracies in the PSR and had not taken notes when they reviewed the PSR. The court denied Harris' request because he had not shown that his current attorney was not providing competent representation, but the court continued sentencing to allow Harris to complete his review of the PSR.

During the continued sentencing hearing, Harris' attorney informed the court of certain things in the PSR that Harris felt were incorrect. Harris also spoke to the district court; he again expressed his desire to represent himself. The court sentenced Harris to 15 to 20 years' imprisonment on each of the drug offenses and 10 to 12 years' imprisonment for the drug money offense, with all three sentences to run concurrently.

At the conclusion of the sentencing hearing, Harris' attorney made an oral motion to withdraw. The district court granted the motion and subsequently appointed different counsel to represent Harris on appeal.

## III. ASSIGNMENTS OF ERROR

Harris asserts that the district court erred in (1) denying his request to conduct his own defense by forcing him against his will to accept court-appointed counsel, (2) threatening to revoke his bond, (3) allowing the State to file an amended information the day of trial, (4) denying Harris' proposed jury instruction No. 1, and (5) denying Harris' motion for new trial.

Harris also asserts that he received ineffective assistance of trial counsel when his counsel failed to (a) object to the revocation of his bond on April 3, 2019, (b) request a continuance after his objection to the filing of the amended information was overruled and the amended information was filed, (c) cross-examine Fox, and (d) communicate adequately with Harris once he was appointed to represent Harris.

## IV. STANDARD OF REVIEW

The question of competency to represent oneself at trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 2704, 206 L. Ed. 2d 844 (2020). The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *Id*.

In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a "clearly erroneous" standard of review. *Id*.

In Nebraska, a trial judge has broad discretion over the conduct of a trial. *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

A ruling on whether to allow a criminal information to be amended is made by the trial court in its discretion. *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015).

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020).

## V. ANALYSIS

### 1. WAIVER OF COUNSEL

Harris asserts that the district court erred in denying his request to conduct his own defense by forcing him against his will to accept court-appointed counsel. He argues that he was found competent to stand trial and because there was no evidence that he suffered from severe mental illness, he should have been allowed to conduct his own defense.

A criminal defendant has a constitutional right to waive the assistance of counsel and conduct his or her own defense under the Sixth Amendment and Neb. Const. art. I, § 11. *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 2704, 206 L. Ed. 2d 844 (2020). However, under Neb. Const. art. I, § 11, a criminal defendant's right to conduct his or her own defense is not violated when the court determines that a defendant competent to stand trial nevertheless suffers from severe mental illness to the point where he or she is not competent to conduct trial proceedings without counsel. *State v. Lewis*, 280 Neb. 246, 785 N.W.2d 834 (2010). The two-part inquiry into whether a court should accept a defendant's waiver of counsel is, first, a determination that the defendant is competent to waive counsel and, second, a determination that the waiver is knowing, intelligent, and voluntary. *State v. Hessler*, 274 Neb. 478, 741 N.W.2d 406 (2007). A court is not required to make a competency determination in every case in which a defendant seeks to waive his or her right to counsel; a competency determination is necessary only when the court has reason to doubt the defendant's competence. See *id.*

The standard for determining whether a defendant is competent to waive counsel is the same as the standard for determining whether a defendant is competent to stand trial. *State v. Jenkins, supra* (person is competent to stand trial if he or she has capacity to understand nature and object of proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make rational defense). However, the competence that is required of a defendant seeking to waive his or her right to counsel is the competence to waive the right, not the competence to represent himself or herself. *Id.*

In affirming a trial court's finding that a defendant was competent to waive his right to counsel and proceed pro se, the Nebraska Supreme Court recently stated:

We are mindful that the competency question is not whether a defendant can ably represent himself or herself. '[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent

himself.' Indeed, 'a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation.'

*State v. Jenkins*, 303 Neb. at 693-94, 931 N.W.2d at 869, quoting *Godinez v. Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (emphasis in original).

In this case, the district court determined that Harris, while competent to stand trial, was not competent to represent himself. While the court did not find that Harris suffered from any mental illness, let alone severe mental illness, it nonetheless determined that the degree of confusion displayed by Harris in the courtroom as to the nature of the proceedings showed that he was not competent to waive his right to counsel and represent himself. Harris argues that the confusion he exhibited about the proceedings at numerous points and non-responsiveness to the court's inquiries was "in the context of him wanting to understand that district court's jurisdiction, not that he did not understand the charges against him or how to represent himself and try a case." Brief for appellant at 28. We disagree.

While the psychiatrist who evaluated Harris found him able to express himself well, to answer questions in a "logical, goal-directed fashion," and to have a good understanding of the trial process and the nature of the proceedings against him, Harris presented a different picture in the courtroom. It is not possible to tell from the record whether Harris truly failed to understand nearly every aspect of the proceedings (as evidenced by his statements in court) or whether he was attempting to obstruct the trial process. The right to self-representation is not absolute, and a "'trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.'" See *State v. Lewis*, 280 Neb. 246, 252, 785 N.W.2d 834, 839 (2010) (quoting *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). The evidence here was sufficient to support the court's determination that Harris was not competent to represent himself. This assignment of error fails.

### 2. THREATENED REVOCATION OF HARRIS' BOND

Harris asserts that the district court erred in threatening to revoke his bond. At the start of trial, after addressing the State's request to amend the information and prior to beginning jury selection, the court inquired whether there was "[a]nything else from counsel." The prosecutor and Harris' attorney both indicated that there was not, but Harris responded affirmatively. The court reminded Harris that he was represented by counsel, and when he continued to interrupt and argue with the judge about the decision to appoint counsel and lack of jurisdiction, the judge instructed Harris to speak only through his counsel. The judge stated that if Harris declined to follow the rules outlined for him, his bond would be revoked and he could participate by video. Harris argues that the court's statement "coerce[d] him from insisting that his right to self-representation not be violated" and had "a chilling effect" on his ability to participate at trial. Brief for appellant at 32.

The district court's instructions to Harris following his argumentative outburst were within the court's broad discretion over the conduct of the trial. See *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). It is the judge's statutory duty to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." Neb. Rev. Stat. § 27-611 (Reissue

2016). Here, the court's statement was reasonable in light of Harris' argumentative behavior and was within the court's discretion. Accordingly, this assignment of error fails.

### 3. FILING OF AMENDED INFORMATION

Harris asserts that the district court erred in allowing the State to file an amended information the day of trial. After the court approved the amendment to add the habitual criminal charge, Harris' attorney asked that he be entitled to "the statutory 24-hour period before he decides how to plead to the amended information." The court denied this request as well.

Harris acknowledges *State v. Cole*, 192 Neb. 466, 222 N.W.2d 560 (1974) (allowing amended information on day of trial to add habitual criminal charge). In that case, the Nebraska Supreme Court determined that the requirement that 1 day shall elapse between service of an information and arraignment relates to the charge which is to be tried and does not apply to a charge that the defendant is a habitual criminal. Harris also acknowledges that the purpose of the 24-hour waiting period provided for by Neb. Rev. Stat. § 29-1802 (Cum. Supp. 2018) is to ensure that the defendant has a reasonable amount of time to prepare his or her defense. *State v. High*, 225 Neb. 695, 407 N.W.2d 772 (1987). Harris does not specifically argue that the district court should not have allowed the State to file an amended information. Instead, he argues that he should have been given more time to consider the State's plea offer. However, Harris does not assign error to the court's denial of 24 hours for purposes of considering the plea offer. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020).

Harris argues that because the district court denied the 24-hour waiting period, he was "given only a matter of minutes to decide how he would plead" after the prosecutor stated the offer on the record. Brief for appellant at 34. He also notes that the court's restatement of the offer did not reflect that the offer was not only to dismiss two counts of the original information and not file the habitual criminal charge, but that the offer was to plead to a lesser charge than reflected in the remaining count of the original information. However, the record shows that the original plea offer (plea to lesser charge in exchange for dismissing remaining counts in this case and all counts in another case) was communicated on May 15, 2019, and that the modified plea offer (adding offer of not filing the habitual criminal charge) was communicated to Harris' attorney on June 13, the day before trial. The prosecutor also expressed his understanding that Harris had decided not to accept the modified plea offer. Thus, the record shows that Harris had nearly a month to consider the original plea offer and a day to consider the modified offer. He does not argue that his attorney failed to communicate these offers to him. Harris has not shown that the court abused its discretion in allowing the State to file an amended information the day of trial.

### 4. PROPOSED JURY INSTRUCTION

Harris asserts that the district court erred in denying his proposed jury instruction No. 1. He argues that definition of "possession" in this proposed instruction was necessary because the definition in the instruction given by the court was incomplete.

The jury instructions given by the district court defined "possession" to mean "either knowingly having it on one's person or knowing of the object's presence and having control over

the object." They also defined "possession of a controlled substance" to mean "knowing of the nature and character of the controlled substance and either knowingly having it on one's person or knowing of its presence and having the right to exercise control or dominion over the controlled substance." Harris' proposed jury instruction added a second sentence to the above definition of "possession," which stated, "Proximity of the defendant, standing alone, is insufficient to prove possession, nor is the mere presence of the defendant." His proposed instruction also specified that this definition was of "possession" of "cocaine or cocaine base."

In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id.*

In this case, the district court used a pattern jury instruction defining possession. See NJI2d Crim. 4.2. Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case. *State v. Valentine*, 27 Neb. App. 725, 726, 936 N.W.2d 16 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 2659, 206 L. Ed. 2d 723 (2020). Recently, in both *Valentine* and in *State v. Castellanos*, 26 Neb. App. 310, 918 N.W.2d 345 (2018), this court upheld jury instructions defining possession patterned directly after NJI2d Crim. 4.2. In both of those cases, the defendant requested that the trial court include language expanding the definition of possession to address presence or proximity in addition to the defendant's dominion or control over the item in question. In both cases, we affirmed the trial court's decision to rely on the pattern jury instruction rather than using the defendant's proposed definition of "possession."

Harris' proposed jury instruction No. 1 was a correct statement of the law. See *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011) (mere presence at place where controlled substance is found is not sufficient to show constructive possession). However, Harris cannot show that he was prejudiced by the district court's refusal to give his proposed instruction. When the instructions that were given are considered together, it is clear the court properly instructed the jury on the definition of "possession" and did not err in refusing to give Harris' proposed instruction.

### 5. MOTION FOR NEW TRIAL

Harris asserts that the district court erred in denying his motion for new trial. He argues that the court should have granted a new trial due to its errors in, among other things, denying his request to conduct his own defense, forcing him to accept court-appointed counsel, and denying his proposed jury instruction No. 1. Given our resolution of Harris' other assignments of error, we

need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346, *cert. denied* ___ U.S. ___, 140 S. Ct. 545, 205 L. Ed. 2d 345 (2019).

### 6. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Harris is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). Once issues of trial counsel's ineffective performance are properly raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.*

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

### (a) Failure to Object to Bond Revocation

Harris asserts he received ineffective assistance of trial counsel when his counsel failed to object to the revocation of his bond on April 3, 2019, after ordering the evaluation of Harris for competency to stand trial. Harris notes that his attorney did not object either to the competency evaluation or to the district court's decision to revoke his bond and that he did not raise the issue until Harris' motion for new trial. His bond was revoked on April 3 when the court ordered the competency evaluation and reinstated 7 days later on April 11 when the court found him competent to stand trial. Harris' bond was not revoked again until the conclusion of the jury trial on June 18. It is clear from this record that counsel's failure to object to the April 3 bond revocation did not prejudice Harris.

### (b) Failure to Request Continuance

Harris asserts he received ineffective assistance of trial counsel when his counsel failed to request a continuance after his objection to the filing of the amended information was overruled and the amended information was filed. We have already determined that the court did not abuse its discretion in allowing the State to file an amended information and that the record reflects that he had more than a few minutes to consider the State's plea offer. Although framed in terms of a request for the 24-hour waiting period reflected in § 29-1802, the request made by Harris' attorney once the court allowed the amendment was in effect a request for a 24-hour continuance for Harris to further consider the plea offer. Harris has not shown that his counsel was deficient in failing to make an additional request for a continuance after the first request was denied.

### (c) Failure to Cross-Examine Fox

Harris asserts he received ineffective assistance of trial counsel when his counsel failed to cross-examine Fox. He argues that her testimony conflicted with that of police officers who testified that Harris and Fox were in the vehicle when the officers contacted them. He notes Fox's testimony that she and Harris were "actually walking already out of the car" when contacted by police, and he argues that if his trial counsel had cross-examined Fox and drawn the jury's attention to this discrepancy, there is a reasonable probability that the jury would have acquitted him on one or more of the charges. Harris cannot show that he was prejudiced by his counsel's failure to cross-examine Fox on this issue, especially when she also testified that she and Harris were seated in the vehicle when contacted by police. The minor discrepancy in her testimony had nothing to do with the issues of whether the substances found in the vehicle were cocaine and cocaine base, whether Harris knew the drugs were there, and whether money associated with drug dealing was recovered from Harris. The evidence showed that the cocaine and cocaine base were located on Harris' side of the vehicle, that the money was recovered from Harris' person, that Harris told police that Fox was not involved, and that Fox told police the drugs were not hers and that she was unaware of their presence. It is clear from this record that counsel's failure to further cross-examine Fox did not prejudice Harris.

### (d) Failure to Communicate

Harris asserts he received ineffective assistance of trial counsel when his counsel failed to communicate adequately with Harris once he was appointed to represent Harris. He argues that his trial counsel, among other things, failed to inform him about jurisdiction, failed to timely inform him of the State's intent to amend the information with a habitual criminal enhancement, and failed to discuss the contents of the presentence investigation report with Harris, despite Harris' attempts to have such discussions with him. The record is insufficient for us to address this claim on direct appeal. The nature and extent of meetings between Harris and his attorney in preparation for trial and other proceedings are not in the record.

## VI. CONCLUSION

For the reasons set forth above, we affirm Harris' convictions and sentences.

AFFIRMED.